[This opinion has been published in *Ohio Official Reports* at 73 Ohio St.3d 1.]

A & B-ABELL ELEVATOR COMPANY, INC., APPELLEE AND CROSS-APPELLANT,

*v.* COLUMBUS/CENTRAL OHIO BUILDING & CONSTRUCTION TRADES COUNCIL

ET AL., APPELLANTS AND CROSS-APPELLEES.

[Cite as *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr.*

*Trades Council*, 1995-Ohio-66.]

*Torts—Libel—Qualified privilege extends to those who provide information to*

*government officials in connection with the qualifications of bidders for*

*public-work contracts.*

Public policy dictates that those who provide information to government officials

who may be expected to take action with regard to the qualifications of

bidders for public-work contracts be given a qualified privilege, thereby

improving the quality and safety of public work.

(No. 93-2415—Submitted February 22, 1995—Decided August 2, 1995.)

Appeal and Cross-Appeal from the Court of Appeals for Franklin County, Nos.

92AP-1540 and 92AP-1541.

———————————

{¶ 1} In October 1989, the state of Ohio, Department of Administrative Services, Office of State Purchasing ("DAS"), issued an invitation to bid on a preventive elevator maintenance contract covering several state buildings. Among other things, the instructions and conditions for submitting the bids provided that "[c]ontracts shall be awarded to the lowest responsive and responsible bidder in accordance with the Ohio Revised Code, Section 125.11."

{¶ 2} In December 1989, the city of Columbus, Department of Public Utilities and Aviation, Division of Airports ("the city"), issued invitations to bid on two maintenance and repair contracts for the main terminal building elevators at Port Columbus International Airport. Among other things, the information to prospective bidders provided that "[t]he Contract will, if let, be awarded to the lowest and best bidder."

{¶ 3} Appellee and cross-appellant, A & B-Abell Elevator Company, Inc. ("Abell"), a nonunion contractor, submitted the lowest bid for the state and city contracts. The next lowest bid, in each case, was submitted by a contractor that employed union labor. The initial investigations made by DAS and the city resulted in a determination that Abell was not only the lowest bidder, but was also, respectively, the lowest responsible and best bidder.

{¶ 4} In the early part of January 1990, however, both DAS and the city decided not to award the respective contracts to Abell. This decision was made, in

large part, on the basis of certain information concerning Abell's past practices on other jobs, submitted by appellant and cross-appellee James R. Rarey, secretary-treasurer of appellant and cross-appellee Columbus/Central Ohio Building and Construction Trades Council ("Building Trades").

{¶ 5} In the latter part of January 1990, both DAS and the city reconsidered their decisions and determined to award the contracts to Abell. The reconsideration followed further investigations concerning the information furnished by Rarey, the institution of legal proceedings by Abell against the state, and written guarantee by Sterrett Lloyd, then branch manager of Abell, to the city that Abell would meet all contract specifications notwithstanding its low bid.

{¶ 6} Abell filed two complaints in the Franklin County Court of Common Pleas, later consolidated, against Rarey, the Building Trades and appellant and cross-appellee International Brotherhood of Elevator Contractors, Local 37 ("Local 37"). Abell alleged that during December 1989 and January 1990, appellants and cross-appellees contacted DAS and the city in an effort to prevent Abell from being awarded the contracts and, in the process, made various false and defamatory communications concerning Abell's business reputation. The complaints set forth four causes of action: (1) tortious interference with a prospective business relationship, (2) tortious interference with contract, (3) defamation, and (4) unlawful disparagement.

{¶ 7} The case proceeded to trial, and the trial court, following Abell's case-in-chief, directed a verdict in favor of appellants and cross-appellees on all of Abell's claims. The following facts, taken from the evidence contained in the record and construed in Abell's favor, are arranged logistically according to the relevant government contract and the alleged defamatory publication.

I

THE CITY CONTRACTS

A

Background

{¶ 8} On December 13, 1989, the bids for the city contracts were opened and read. James F. Fielding, a business agent for Local 37, and Sterrett Lloyd were both present at the bid opening. After the bids were opened, Fielding stated to Lloyd that "you will pay prevailing wage on this job or I will bury you in this town." Thereafter, Fielding began to collect negative information about Abell, which he considered to be "gunpowder" to use against Abell.

{¶ 9} As relevant here, Fielding came into possession of two sources of information. The first was a videotape of a June 1988 news broadcast by WISH Channel 8 News out of Indianapolis, Indiana (the "WISH tape"). The broadcast

began: "Good evening, Indiana taxpayers are being ripped off. Their safety possibly threatened by some elevator workers who are not conducting state mandated safety tests." The broadcast continued, reporting that "State officials paid the Abell Elevator Company more than $40,000 to maintain, inspect and test six elevators at the Logansport State Mental Hospital." This was followed by an interview with Chuck Foster, a former employee of Abell, who claimed that the elevators at Logansport, as well as at Muscatatuck State Hospital, were not tested, that documents were falsified to indicate that the tests had been performed, and that he was never trained to perform the tests.

{¶ 10} Also interviewed during the broadcast was James I. Clark, who, at the time, was the Director of the Division of Elevator Safety for the state of Indiana. Clark stated that he felt "the safety test was not performed. So, apparently, the allegations by the former employee, have some merit."[1]

{¶ 11} The second source of information collected by Fielding was a letter dated December 20, 1989 from Steve Scott, branch manager of Montgomery Elevator Company ("Montgomery"), to Bill Rice, an assistant to Philip Delbert, administrative officer for the city in charge of engineering and construction ("the Scott letter"). Montgomery was the lowest bidder after Abell for the city contracts. The letter was an attempt to establish that Montgomery was a better qualified bidder than Abell. Attached to the letter was a page which, among other things, listed three "references" where Abell had previously performed work: the Indianapolis Federal Building, the Fort Wayne Housing Authority, and the Colerain Veterinary Clinic in Cincinnati. Each of these "references" was followed by the notation: "CONTRACT CANCELLED FOR NON-PERFORMANCE."

B

Rarey's Letter

{¶ 12} After Fielding collected the information concerning Abell, he contacted Rarey and gave Rarey a copy of the WISH tape. After viewing the tape, Rarey contacted Charles Mentel, legislative research office manager for the city. Rarey asked Mentel to look into the bids for the airport and to arrange for him (Rarey) to meet with Delbert. Subsequently, Rarey and Delbert spoke on the telephone, at which time Rarey told Delbert about the WISH tape. Delbert told Rarey "to put all of that in writing for [him] first before [he] would act on it."

{¶ 13} Accordingly, on December 22, 1989, Rarey wrote to Delbert as follows:

---

1. Clark testified at trial that, based on his investigation into the matter, he concluded that no safety tests were done by Abell at Logansport hospital, the test reports were falsified, and Foster did not know how to perform a safety test. He also testified that there were other facilities at which Foster was involved with testing elevators for Abell.

"Dear Mr. Delbert:

"I recently became aware that bids were being taken for the maintenance and repair of elevators and escalators at the airport.

"It is my understanding that Able [*sic*] Elevators Inc. is one of the bidders. It is also my understanding that it is not only the lowest but also the most responsible bidder that will receive the contract.

"As a concerned citizen and taxpayer, I believe that Able [*sic*] Elevator is not going to be able to provide the quality of service the City of Columbus requires and could also compromise the safety of the general public.

"One only has to look at our neighboring state of Indiana and the city of Indianapolis. Able [*sic*] Elevator not only falsified safety and maintenance records at the Logansport State Hospital, but charged the State $40,000 for this service. This apparently was only one of a number of instances that Able [*sic*] Elevator Inc. perpetrated on the state of Indiana and the public. I have substantiating evidence on tape from Indianapolis television station WISH Channel 8 to prove all of the above accusations and I am willing to supply you with the tape so you may see for yourself.

"As a taxpayer I do not think that either quality or safety should be sacrificed or compromised. I strongly urge you not to award Able [*sic*] Elevator Inc. the contract at Port Columbus. I feel that an operation based on deceit and bilking the public has no place in the central Ohio area.

"If you have any questions, I will be more than happy to help in any way I can.

"Sincerely,

"James W. Rarey Secretary-Treasurer"

{¶ 14} On January 4, 1990, Rarey met with Delbert and Delbert's counsel, Assistant City Attorney Daniel Drake, and played the tape for them.

C

The Scott Letter

{¶ 15} After receiving the December 20, 1989 letter from Scott, the city, on December 28, 1989, interviewed the three "references" that were listed in the attachment to the letter. Although the "references" were quite unfavorable to Abell, it was not necessarily true, as noted in the attachment to the Scott letter, that the contracts referred to therein were "cancelled for nonperformance." Additionally, the city did not consider the information given to it during these interviews, by itself, to be sufficient reason not to award the city contracts to Abell.

{¶ 16} The city did, however, prepare three typewritten documents summarizing the complaints made by the interviewees, a copy of which Delbert

4

gave to Rarey during their meeting on January 4, 1990. Those documents read as follows:

"Ft. Wayne Housing Authority

"Ft. Wayne, Indiana

"Mr. Bob Bower

"219-427-1257

"12/28/89 - 3:30 P.M.

"Very poor service—can't seem to get the elevator repaired.

"Two (2) service people called his company. On some occasions service personnel left job without completing work.

"Bid low to get work then did not perform.

"If they run into a problem the service people were unable to handle, had to call into company for further assistance."

"Indianapolis Indiana Federal Building

"Mr. Rollin Elliott

"317-226-6238

"12/28/89 - 3:45 P.M.

"Not sending mechanics to look at elevators, only helpers. Can't get parts to repair the elevators he has had two (2) cars down for two (2) weeks.

"Not getting maintenance done on time and don't really know what some of the problems are and how to repair them when they get to the site.

"He won't recommend Abell, to any who wants service and safety."

"Cincinnati, Ohio

"Colerain Veterinary Clinic

"Dr. John Leis

"1-513-923-440

"12/28/89 - 3:25 P.M.

"Spring of 1989 - Bid

"They changed the bid figures after they quoted on the job!

"They had not been able to buy parts from the other elevator companies without some kind of. delays.

"Abell did not show any concern at all for his business and he has not had a good experience."

{¶ 17} At some point in time, Rarey met with Stephen Soble, staff assistant to Councilman M. D. Portman. Rarey told Soble that "Abell had done some unsavory things in other places," informed him as to the existence of the WISH

tape, and gave Soble a copy of the attachment to the Scott letter.[2]  The record is not clear, however, whether this meeting occurred prior or subsequent to the January 4 meeting between Rarey, Delbert, and Drake.  Thereafter, Soble met with Delbert and was satisfied that the city had addressed all of Rarey's concerns.

II

THE

STATE CONTRACT

{¶ 18} On January 4, 1990, Rarey and Victor Goodman, counsel for the Building Trades, contacted Paula Brooks, Assistant Director of DAS.  Rarey and Goodman informed Brooks that "there was a pending bid, and there would potentially be some issues related to training deficiencies and possible safety problems thereby."   Following this conversation, Rarey faxed several documents to Brooks, including the typewritten summaries of the city's interviews on December 28, 1989 with the "references" listed on the attachment to the Scott letter. Rarey and Goodman also arranged for the WISH tape to be delivered to Brooks.  In addition, Goodman told Brooks that if Abell was awarded the contract, he would give "facts and information to *The [Columbus] Dispatch* [where his] son-in-law worked."

{¶ 19} The court of appeals affirmed the directed verdict as to all causes of action, except that of defamation, which it reversed and remanded to the trial court for further proceedings.

{¶ 20} The cause is now before this court pursuant to the allowance of  a discretionary appeal and cross-appeal.

_____

*Emens, Kegler, Brown, Hill & Ritter, Ronald L. Mason* and *Timothy T. Tullis*, for appellee and cross-appellant.

*Benesch, Friedlander, Coplan & Aronoff, James F. DeLeone, Orla E. Collier III* and *Mark D. Tucker*, for appellants and cross-appellees.

_____

ALICE ROBIE RESNICK, J.

{¶ 21} The pivotal issue in this case is whether the communications by appellants and cross-appellees to DAS and the city were published on a privileged occasion.[3]  If a conditional or qualified privilege extends to those who provide

---

2. Although Rarey testified that he did not give Soble this document, Soble testified that he received the attachment to the Scott letter from Rarey.  Since this action arises from the granting of a directed verdict against Abell, we must construe the evidence favorably to Abell.  Civ.R. 50(A)(4).

3. Abell asserts that the issue of conditional or qualified privilege was not raised below and, therefore, should not be considered by the court.  Our review of the record, however, demonstrates that the issue was, in fact, raised in both the trial court and the court of appeals.  Appellants and

information to government officials in connection with the qualifications of bidders for public-work contracts, then only two issues remain. The first is whether Abell presented sufficient evidence at trial regarding "actual malice" to withstand a directed verdict on its defamation claim. If not, the second issue becomes whether Abell is nevertheless entitled to pursue its other claims for tortious interference and unlawful disparagement.

## QUALIFIED PRIVILEGE

{¶ 22} In Ohio, "libel"[4] is defined generally as a false written publication, made with some degree of fault, reflecting injuriously on a person's reputation, or exposing a person to public hatred, contempt, ridicule, shame or disgrace, or affecting a person adversely in his or her trade, business or profession. *Becker v. Toulmin* (1956), 165 Ohio St. 549, 553, 60 O.O. 502, 504, 138 N.E.2d 391, 395; *Cleveland Leader Printing Co. v. Nethersole* (1911), 84 Ohio St. 118, 95 N.E.2d 735, paragraph two of the syllabus. See *Matalka v. Lagemann* (1985), 21 Ohio App.3d 134, 136, 21 OBR 143, 145, 486 N.E.2d 1220, 1222 (defamation); *Hersch v. E.W. Scripps Co.* (1981), 3 Ohio App.3d 367, 374, 3 OBR 430, 438, 445 N.E.2d 670, 678; *Thomas H. Maloney & Sons, Inc. v. E. W. Scripps Co*. (1974), 43 Ohio App.2d 105, 107, 72 O.O.2d 313, 315, 334 N.E.2d 494, 497.

{¶ 23} The defendant in a libel action may invoke the defense of "conditional" or "qualified privilege." *Hahn v. Kotten* (1975), 43 Ohio St.2d 237, 243, 72 O.O.2d 134, 138, 331 N.E.2d 713, 718. See *McCartney v. Oblates of St. Francis de Sales* (1992), 80 Ohio App.3d 345, 354, 609 N.E.2d 216, 222, jurisdiction denied (1995), 65 Ohio St.3d 1443, 600 N.E.2d 685; *Douglas Elec. Corp. v. Grace* (1990), 70 Ohio App.3d 7, 12, 590 N.E.2d 363, 366; *Hersch*, *supra*, at 374-375, 3 OBR at 438, 445 N.E.2d, 678-679. Where the circumstances of the occasion for the alleged defamatory communications are not in dispute, the determination of whether the occasion gives the privilege is a question of law for the court. *Worrell v. Multipress, Inc.* (1989), 45 Ohio St.3d 241, 248-249, 543 N.E.2d 1277, 1283; *Becker v. Toulmin*, *supra*, at 554, 60 O.O. at 505, 138 N.E.2d at 395; *Mauk v. Brundage* (1903), 68 Ohio St. 89, 67 N.E. 152, paragraph two of the syllabus. See *McCartney*, *supra*, at 355, 609 N.E.2d at 223; *West v. Peoples Banking & Trust Co.* (1967), 14 Ohio App.2d 69, 74-75, 43 O.O.2d 197, 200, 236 N.E.2d 679, 682.

---

cross-appellees raised the issue as an affirmative defense in their answers in the trial court, and again in their briefs to the court of appeals.

4. Abell's defamation claim, as revealed in its brief, is a libel claim. Abell's position on appeal is that it "sustained its burden of proving each element in the present case with respect to (1) Rarey's letter to the City and the (2) republication of the Scott letter."

{¶ 24} No single statement or formula can sufficiently describe when publication of defamatory matter should be conditionally or qualifiedly privileged. It is generally agreed, however, that the best description was that offered by Baron Parke in *Toogood v. Spyring* (1834), 149 Eng.Rep. 1044, 1049-1050, 1 C.M.&R. 181, 193: A publication is privileged when it is "fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned." See *Hahn*, *supra*, at 244, 72 O.O.2d at 138, 331 N.E.2d at 718; Prosser & Keeton, The Law of Torts (5 Ed.1984) 825, Section 115; 2 Harper, James & Gray, The Law of Torts (2 Ed.1986) 219, Section 5.26.

{¶ 25} In *Hahn*, this court explained further that:

""A publication is conditionally or qualifiedly privileged where circumstances exist, or are reasonably believed by the defendant to exist, which cast on him the duty of making a communication to a certain other person to whom he makes such communication in the performance of such duty, or whether the person is so situated that it becomes right in the interests of society that he should tell third persons certain facts, which he in good faith proceeds to do. This general idea has been otherwise expressed as follows: A communication made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, even though it contains matter which, without this privilege, would be actionable, and although the duty is not a legal one, but only a moral or social duty of imperfect obligation. The essential elements of a conditionally privileged communication may accordingly be enumerated as good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only. The privilege arises from the necessity of full and unrestricted communication concerning a matter in which the parties have an interest or duty, and is not restricted within any narrow limits.""" (Emphasis omitted.) *Id.* at 245-246, 72 O.O.2d at 139, 331 N.E.2d at 719, quoting 33 American Jurisprudence (1941) 124-125, Libel and Slander, Section 126.

{¶ 26} The defense of qualified privilege is deeply rooted in public policy. It applies in a variety of situations where society's interest in compensating a person for loss of reputation is outweighed by a competing interest that demands protection. Accordingly, the privilege does not attach to the communication, but to the occasion on which it is made. It does not change the actionable quality of the publication, but heightens the required degree of fault. This affords some latitude for error, thereby promoting the free flow of information on an occasion worthy of

protection. *Jacobs v. Frank* (1991), 60 Ohio St.3d 111, 114, 573 N.E.2d 609, 612; *Surace v. Wuliger* (1986), 25 Ohio St.3d 229, 231, 25 OBR 288, 290, 495 N.E.2d 939, 941; *Hahn, supra*, at 244, 72 O.O.2d at 138, 331 N.E.2d at 718-719; Prosser & Keeton, The Law of Torts, *supra*, at 824-825, Section 115; 2 Harper, James & Gray, The Law of Torts, supra, Sections 5.21 and 5.25; 50 American Jurisprudence 2d (1970), Libel and Slander, Sections 195 and 196.

{¶ 27} One type of interest protected by a qualified privilege is the public interest. The "public interest" privilege "involves communications made to those who may be expected to take official action of some kind for the protection of some interest of the public." Prosser & Keeton, The Law of Torts, *supra*, at 830, Section 115. See, also, 3 Restatement of the Law 2d, Torts (1977) 281, Section 598.[5]

{¶ 28} We recognized such a privilege in *Jacobs, supra*, at paragraph one of the syllabus:

"Public policy concerns dictate that those who provide information to licensing boards pursuant to R.C. 2305.25 be given a qualified privilege in order to aid in the dissemination of information to those boards, thereby improving the quality of health care administered to the general public."

{¶ 29} We explained further that "the public has an interest in ensuring that only qualified persons are licensed to practice podiatry." *Id.* at 114, 573 N.E. 2d at 612.

{¶ 30} The same reasoning is applicable to those who provide information to the government in connection with the qualifications of bidders for public-work contracts. The public has an interest in ensuring that only competent, reliable and responsible contractors receive public work, particularly where the work affects the public's safety. Because of this interest, it is the right of every citizen to communicate with his or her government and its officers on matters that affect the discharge of their duties in this regard. Conversely, the government must freely receive information concerning prospective public-work contractors, in order to effectively screen bids and evaluate the contractor's qualifications and record for safety and responsibility. Public policy dictates, therefore, that those who provide information to government officials who may be expected to take action with regard to the qualifications of bidders for public-work contracts be given a qualified privilege, thereby improving the quality and safety of public work. See *Stevenson*

---

5. Section 598 of the Restatement of Torts 2d provides as follows:
    "Communication to One Who May Act in the Public Interest
    "An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that
    "(a) there is information that affects a sufficiently important public interest, and
    "(b) the public interest requires the communication of the defamatory matter to a public officer or a private citizen who is authorized or privileged to take action if the defamatory matter is true."

*v. Morris* (1927), 288 Pa. 405, 408, 136 A. 234, 235; *Bearce v. Bass* (1896), 88 Me. 521, 543-544, 34 A. 411, 414; *Cook v. Hill* (1849), 5 N.Y.Super.Ct. (3 Sandf.) 341, 348; Annotation, Libel and slander: privilege of communications made by private person or concern to public authorities regarding one not in public employment (1942), 136 A.L.R. 543, 553; 50 American Jurisprudence 2d, *supra*, at 728, Section 216. See, also, *Rogers Elec. & Sec. Co. v. Olsavsky* (Apr. 22, 1994), Trumbull App. No. 93-T-4879, unreported, 1994 WL 171719, jurisdiction denied (1994), 70 Ohio St.3d 1457, 639 N.E.2d 795.

{¶ 31} Rarey's communications to Delbert and Soble were made in connection with the circumstances surrounding the bidding and procurement of public-work contracts. The information disseminated, although allegedly defamatory, was limited in scope to matters that reflected on Abell's qualifications to perform the work in a safe, reliable and responsible manner. The publications were made to those public officials who may be expected to take action for the protection of the public interest in that regard.

{¶ 32} Rarey's communications also appear to have been made in good faith. In his December 22, 1989 letter to Delbert, Rarey stated that "[a]s a concerned citizen and taxpayer, I believe that Able [*sic*] Elevator is not going to be able to provide the quality of service the City of Columbus requires and could also compromise the safety of the general public." Once Rarey asserted that his statements were made in good faith, Abell had the burden of showing that Rarey acted with actual malice. *Jacobs*, *supra*, at 119, 573 N.E.2d at 616. "''All that is necessary to entitle such communications to be regarded as privileged is, that *the relation of the parties* should be such as to afford reasonable ground for supposing an innocent motive for giving information * * *.''" (Emphasis added.) *Hahn*, *supra*, at 246, 72 O.O.2d at 139-140, 331 N.E.2d at 720, quoting 1 Harper & James, The Law of Torts (1956) 445, Section 5.26.

{¶ 33} This is not to say that Rarey's motive was in fact innocent. Indeed, Rarey received the disputed information from Fielding, who, it can be inferred, was motivated to "bury" Abell for not paying prevailing wage. In determining whether an occasion is privileged, however, we are not concerned with the motive of a particular defendant. See, *e.g.*, *Webster v. Sun Co., Inc*. (C.A.D.C.1986), 790 F.2d 157, 161. Instead, we "have to deal with the law of general averages based on human experience and must shape a general policy to deal with a general problem. On the other hand, in the question of abuse of privilege, the problem is one of particulars." 2 Harper & James, The Law of Torts, *supra*, at 214, Section 5.25.

{¶ 34} The issue of "good faith" necessary to establish the privilege should not be confused with the issue of "state of mind" necessary to defeat it. See, *e.g.*,

*St. Amant v. Thompson* (1968), 390 U.S. 727, 732, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262, 267-268.

{¶ 35} "This distinction has been obscured, especially in the English cases, by the theory that a privileged occasion is such because the circumstances repel the inference of malice; that is, they are more consistent with the absence than the presence of malice. The fallacy of this rationale is apparent when it is remembered that 'malice' in any real sense is an unimportant factor in defamation unless the publication is made upon a privileged occasion. It is strange indeed, then, that the fact that the circumstances negative the inference of malice is the factor that makes a situation privileged." 2 Harper & James, The Law of Torts, *supra*, at 214-215, Section 5.25.

{¶ 36} The issue of malice is consigned to the question of abuse of privilege. It does not arise unless a privilege is first found to exist. It is anomalous to suggest that the existence of a privilege is dependent upon that which is not called into play but for the existence of the privilege. Moreover, in Ohio a qualified privilege can be defeated only by a clear and convincing showing that the communication was made with actual malice. *Jacobs*, *supra*, paragraph two of the syllabus. Thus, the lack of an innocent motive on the part of the defendant is insufficient to defeat the privilege. *Id.* at 118, 573 N.E.2d at 616. If we were to make the existence of a qualified privilege dependent upon the innocent motive of a defendant, we would effectively allow the privilege to be defeated by a showing of something less than actual malice, thereby circumventing the protection afforded by *Jacobs*, *supra*.

{¶ 37} Accordingly, we hold that the communications by Rarey to Delbert and Soble were made on a privileged occasion.[6]

## ACTUAL MALICE

{¶ 38} In *Jacobs*, *supra*, at paragraph two of the syllabus, we held that:

"When a defendant possesses a qualified privilege regarding statements contained in a published communication, that privilege can be defeated only by a clear and convincing showing that the communication was made with actual malice. In a qualified privilege case, 'actual malice' is defined as acting with knowledge that the statements are false or acting with reckless disregard as to their truth or falsity."

---

6. Abell implies that the issue of qualified privilege cannot be decided upon directed verdict at the conclusion of a plaintiff's case. This is contrary to our holding in *Costanzo v. Gaul* (1980), 62 Ohio St.2d 106, 111-112, 16 O.O.3d 134, 137, 403 N.E.2d 979, 983, that "based on the law established by Hahn, the trial court did not err in directing a verdict at the conclusion of the plaintiff's case."

{¶ 39} This standard carries the requirement that we conduct an independent review of the sufficiency of the evidence. *Id.* at 116, 573 N.E.2d at 614.

A

The Scott Letter

{¶ 40} Abell argues that at the time Rarey gave Soble the attachment to the Scott letter, Rarey had actual knowledge that the contracts referenced in the attachment were not "cancelled for non-performance." Abell contends that such knowledge was imparted by virtue of the summaries of Delbert's phone conversations with those listed as "references" in the Scott letter; which Delbert gave to Rarey on January 4, 1990.

{¶ 41} Even assuming that Rarey met with Soble after January 4, 1990, there is nothing in Delbert's summaries that would indicate falsity in the statement that Abell's contracts with the "references" listed in the Scott letter were "cancelled for non-performance." Quite the contrary, Delbert's summaries, if anything, would appear to *confirm* that Abell's contracts with Indianapolis, Fort Wayne and the Colerain Veterinary Clinic were cancelled for nonperformance. While those summaries are silent as to whether or not the contracts were actually cancelled, they are replete with complaints about nonperformance and failure to complete work. This does nothing to indicate that Rarey knew that Scott's statement was false or that he was aware of a high probability of its falsity. *Jacobs*, *supra*, at 119, 573 N.E.2d at 616.

{¶ 42} Accordingly, we find the evidence insufficient, as a matter of law, to establish actual malice with regard to the republication of the attachment to the Scott letter.

B

Rarey's Letter

{¶ 43} Abell contends that Rarey's December 22, 1989 letter to Delbert was written with reckless disregard as to the truth or falsity of the statements contained therein. Abell's argument in this regard is twofold. First, Abell contends that Rarey's failure to conduct an investigation into the matter amounts to reckless disregard. Second, Abell argues that Rarey's statements were reckless because he had no knowledge of any facts to support them.

{¶ 44} In order to establish "reckless disregard," the plaintiff must present sufficient evidence to permit a finding that the defendant had serious doubts as to the truth of his publication. Thus, the failure to investigate before publishing will not defeat a qualified privilege, unless the defendant entertained serious doubts as to the truth of his statements or the veracity or accuracy of his sources. *St. Amant*,

*supra*, 390 U.S. at 733, 88 S.Ct. at 1326, 20 L.Ed.2d at 268; *Dale v. Ohio Civ. Serv. Emp. Assn.* (1991), 57 Ohio St.3d 112, 118, 567 N.E.2d 253, 258, fn. 3.

{¶ 45} Reckless disregard, however, is likely to be found "where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call." *Id.*, 390 U.S. at 732, 88 S.Ct. at 1326, 20 L.E.2d at 268.

{¶ 46} The record is insufficient to establish that Rarey acted with reckless disregard as to whether the statements in his December 22, 1989 letter were true or false. There is no evidence in the record that Rarey invented the accusations he made against Abell in his letter to Delbert. Instead, Rarey firmly believed that he had "substantiating evidence on tape from Indianapolis television station WISH Channel 8 to prove all of the above accusations and [was] willing to supply * * * the tape" so Delbert could "see for [himself]." Nor can malice be inferred from the statements in Rarey's letter that purport to summarize or editorialize the content of the WISH tape. Actual malice cannot "'be implied from the character and content of a publication. * * * It is not sufficient for a libel plaintiff to show that an interpretation of facts is false; rather, he must prove with convincing clarity that defendant was aware of the high probability of falsity.'" *Jacobs*, *supra*, at 118-119, 573 N.E.2d at 616, quoting *Dupler v. Mansfield Journal Co.* (1980), 64 Ohio St.2d 116, 122-123, 18 O.O.3d 354, 358, 413 N.E.2d 1187, 1193. Moreover, Abell does not dispute the accuracy of the WISH broadcast, or the veracity of Channel 8 News.

{¶ 47} Abell, however, seeks to establish reckless disregard on Rarey's part solely by virtue of Rarey's failure to investigate, without first establishing the requisite "serious doubt." "Mere negligence is not enough to establish actual malice." *Dale*, *supra*, at 118, 567 N.E.2d at 258. Thus, "reckless conduct is not measured by whether a reasonably prudent man * * * would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant*, *supra*, 390 U.S. at 731, 88 S.Ct. at 1235, 20 L.Ed.2d at 267. There is no such evidence in this case.[7]

---

7. The parties have directed a large portion of their arguments toward the issue of whether the language in Rarey's letter, "I feel that an operation based on deceit and bilking the public has no place in the central Ohio area," is a statement of fact or opinion. We need not determine whether this statement is an opinion in the constitutional sense. See *Vail v. The Plain Dealer Publishing Co.* (1995), 72 Ohio St.3d 279, 649 N.E.2d 182; *Scott v. News-Herald* (1986), 25 Ohio St.3d 243, 249-250, 25 OBR 302, 308, 496 N.E.2d 699, 705; Restatement of the Law 2d, Torts, supra, at 170-175, Section 566. Whether such statement is additionally protected by the Constitution becomes irrelevant in light of our determination that no actual malice has been shown. Regardless of the quality of Rarey's statement as fact or opinion, it was nevertheless communicated on a privileged occasion without serious doubts as to its accuracy or an awareness of a high probability of its falsity.

{¶ 48} Accordingly, we find the evidence insufficient, as a matter of law, to establish actual malice with regard to Rarey's letter to Delbert, and the judgment of the court of appeals is reversed as to this issue.

DERIVATIVE CLAIMS

{¶ 49} The torts of interference with business relationships and contract rights generally occur when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another. See *Juhasz v. Quik Shops, Inc.* (1977), 55 Ohio App.2d 51, 57, 9 O.O.3d 216, 219, 379 N.E.2d 235, 238; *Reichman v. Drake* (1951), 89 Ohio App. 222, 226, 45 O.O. 444, 446, 100 N.E.2d 533, 536; *McDonough v. Kellogg* (D.C.Va.1969), 295 F.Supp. 594, 598. See, also, *Walter v. Murphy* (1988), 61 Ohio App.3d 553, 573 N.E.2d 678, jurisdiction denied (1989), 41 Ohio St.3d 729, 536 N.E.2d 384, modifying *Juhasz*.

{¶ 50} In addition, R.C. 4165.03 provides a civil remedy to "[a] person injured by a deceptive trade practice of another." A deceptive trade practice occurs when a person, in the course of his business, vocation or occupation, "[d]isparages the goods, services, or business of another by false representations of fact." R.C. 4165.02(H). See, also, *Akron-Canton Waste Oil, Inc. v. Safety-Kleen Oil Serv., Inc.* (1992), 81 Ohio App.3d 591, 598-599, 611 N.E.2d 955, 960, jurisdiction denied (1992), 65 Ohio St.3d 1458, 602 N.E.2d 254.

{¶ 51} "In such cases the law has generally required proof that the defendant has acted maliciously." *Haller v. Borror Corp.* (1990), 50 Ohio St.3d 10, 16, 552 N.E.2d 207, 212-213.

{¶ 52} The standard of malice required to be shown in these cases, as well as the determination of privilege, may be different from what it is with respect to defamation cases. The question here, however, is whether the actual-malice standard required to defeat a qualified privilege in a defamation claim under *Jacobs*, *supra*, must also be met for tortious interference and disparagement claims based on the same protected conduct or statements. We hold it does.

{¶ 53} In *Local Lodge 1297 v. Allen* (1986), 22 Ohio St.3d 228, 22 OBR 407, 490 N.E.2d 865, paragraph two of the syllabus, we held that "[a]lthough the National Labor Relations Act does not pre-empt a state's recognition of causes of action for intentional infliction of emotional distress or invasion of privacy, neither cause of action may be predicated on the mere use of federally protected language in the context of a labor dispute."

{¶ 54} The concurring opinion in *Local 1297* pointed out that the tort claims were no more than various legal theories to remedy the alleged wrong of defamation. *Id.* at 234, 22 OBR at 412, 490 N.E.2d at 871, (Douglas, J.,

concurring). Accordingly, to make such protected speech actionable under any of the advanced legal theories, the plaintiff must prove that the defendant "knew [his statements] were false or acted with reckless disregard of whether they were true or false." *Id*. at 235, 22 OBR at 413, 490 N.E.2d at 871.

{¶ 55} More recently, the majority of this court held that "[s]ince we have concluded that the statements at issue are constitutionally protected speech, [the plaintiff's] claims for intentional infliction of emotional distress must also fail." *Vail v. The Plain Dealer Publishing Co.* (1995), 72 Ohio St.3d 279, 283, 649 N.E.2d 182, 186.

{¶ 56} In *Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union, Local 655* (C.A.8, 1994), 39 F.3d 191, the Eighth Appellate Circuit held that when defamation and tortious interference actions are based on the same statements, the protection afforded by virtue of the heightened standard of malice must apply to both claims. The court explained that "[t]his is only logical as a plaintiff may not avoid the protection afforded by the Constitution and federal labor law merely by the use of creative pleading." *Id.* at 196.

{¶ 57} In *Smith v. Ameriflora 1992, Inc.* (1994), 96 Ohio App.3d 179, 187, 644 N.E.2d 1038, 1043, jurisdiction denied (1994), 71 Ohio St.3d 1457, 642 N.E.2d 635, the court of appeals held that once a qualified privilege was found to exist by virtue of the relationship of the parties, the heightened actual-malice standard must be applied to the plaintiff's tortious interference claim as well as his defamation claim.

{¶ 58} Qualified privileges adhere to certain occasions because public policy embraces an interest worthy of protection. The privilege cannot be lost without a showing of actual malice, *i.e.*, knowledge of falsity or reckless disregard for the truth. To permit the imposition of liability on the basis of something less than actual malice, merely because the same publication is alleged to be actionable on some other legal theory, would drastically frustrate the objective of promoting candid input on matters of public concern. The public-interest privilege is not so tenuous that it cannot withstand such attempted circumvention.

{¶ 59} We hold that where claims such as tortious interference and disparagement are based on statements that are qualifiedly privileged under defamation law, the protection afforded those statements under *Jacobs*, *supra*, at paragraph two of the syllabus, must also apply in the derivative claims. In such a case, in order to succeed on any of his claims, the plaintiff must clearly and convincingly show that the communication was made with actual malice, *i.e.*, with knowledge that the statements are false or with reckless disregard as to their truth or falsity.

{¶ 60} Accordingly, Abell's derivative claims must fail, and the judgment of the court of appeals is affirmed as to this issue.

{¶ 61} For all of the foregoing reasons, the judgment of the court of appeals is reversed in part and affirmed in part, and the judgment of the trial court is reinstated.

*Judgment reversed in part*
*and affirmed in part.*

DOUGLAS and F.E. SWEENEY, JJ., concur.

HARSHA, J., concurs in part and dissents in part.

MOYER, C.J., and COOK, J., concur in judgment only.

PFEIFER, J., dissents.

WILLIAM H. HARSHA III, J., of the Fourth Appellate District, sitting for WRIGHT, J.

_____

**HARSHA, J., concurring in part and dissenting in part.**

{¶ 62} I agree that all claims against "Local 37" were properly dismissed by the trial court, but for a slightly different reason than the majority, as Abell failed to introduce *any* evidence of tortious conduct on the Local's part. I also agree with the syllabus and the majority's holding that a qualified privilege exists concerning public-work contracts. However, I would not apply this common-law privilege to statutory causes of action, as does the majority. When the legislature adopts public policy in the form of a statutory remedy, the courts are not free to amend that enactment by the application of common-law privilege, notwithstanding the common source of conduct from which all claims spring. See *Thompson v. Ford* (1955), 164 Ohio St. 74, 57 O.O. 96, 128 N.E.2d 111; *Mitchell v. Ross* (1984), 14 Ohio App.3d 75, 14 OBR 87, 470 N.E.2d 245.

{¶ 63} R.C. 4165.02 *et seq.* provides a civil remedy for a person who is injured by the unlawful disparagement of its services or business interests by virtue of false representations of fact. The statute does not reference a specific mental state, nor does it provide for a privilege which is applicable to these facts. I would not add an element or append a defense where the legislature has chosen not to do so. Accordingly, I would sustain Abell's cross-appeal as it relates to the purported acts of unlawful disparagement by the defendants other than Local 37.

{¶ 64} In all other respects, I concur with the majority.

_____

**COOK, J., concurring in judgment.**

{¶ 65} I concur in the decision to reverse the judgment of the court of appeals and reinstate the trial court's judgment, but respectfully do so for a different

reason. I would not reach the issue of whether the communications by appellants and cross-appellees to DAS and the city were published on a privileged occasion because I would hold that Abell failed to establish a prima facie case in that it failed to show that the statements at issue were false.

{¶ 66} In a defamation claim, one of the elements necessary for the plaintiff to establish a prima facie case is the falsity of the statements at issue. See *Hersch v. E.W. Scripps Co.* (1981), 3 Ohio App.3d 367, 374, 3 OBR 430, 438, 445 N.E.2d 670, 678; and *Tohline v. Cent. Trust Co.*, N.A. (1988), 48 Ohio App.3d 280, 284, 549 N.E.2d 1223, 1228. Although the court of appeals found that the WISH tape itself was not defamatory and the information related concerning the tape was accurate, the court further determined that "the problem arises when Rarey attempted to use the videotape to support his other statements because no one provided information showing that the failure to inspect the elevators was the result of a disgruntled employee and was not condoned by Abell." The court, therefore, placed the burden on Rarey and Local 37 to produce information mitigating the factual content of the tape.

{¶ 67} The court of appeals' opinion presumes that because Abell's problems in Indiana were the result of a disgruntled employee as shown by the WISH tape, such shortcoming should not reflect on the reputation of his employer. The admittedly true information on the tape was that the company through its employees had falsified safety and maintenance records. A corporation, however, acts only through its agents and employees. Abell's own witnesses confirmed that Abell was paid more than $40,000 to maintain, test and inspect the elevators at Logansport and that the tests were not in fact performed. Thus, whether Abell condoned the acts of a disgruntled employee is not relevant to whether the statements asserted by Rarey were false.

{¶ 68} The remaining statements in Rarey's letter are statements of his personal opinions based solely on the WISH tape. Rarey wrote: "As a taxpayer *I do not think* either quality or safety should be sacrificed or compromised. * * * *I feel* that an operation based on deceit and bilking the public has no place in the central Ohio area." (Emphasis added.) Rarey's letter specifically states that his opinion and evaluations are substantiated by the WISH tape and leaves no reasonable person to believe that he was asserting any fact other than the content of the WISH tape. Since that tape, by Abell's own admissions, contained true and accurate information, I concur with the majority decision to reverse the judgment of the court of appeals and reinstate the directed verdict of the trial court.

MOYER, C.J., concurs in the foregoing opinion.

―――――――――――

**PFEIFER, J., dissenting.**

{¶ 69} "[Y]ou will pay prevailing wage on this job or I will bury you in this town," said James Fielding to Sterrett Lloyd. Those are not exactly the words of a patriotic citizen worried that his civic pride might be bruised by shoddy workmanship on the public library. They are, however, fairly typical words that may be used in the high-stakes world of public-contract bidding. I do not agree that public policy demands that this court carve out a privilege which should protect such threats and the acts that spring forth from them.

{¶ 70} The majority points to the statutorily defined public-interest privilege this court dealt with in *Jacobs v. Frank* (1991), 60 Ohio St.3d 111, 573 N.E.2d 609. In that case, this court held that "the public has an interest in ensuring that only qualified persons are licensed to practice podiatry." *Id.* at 114, 573 N.E.2d at 612. That is true. When the state is licensing people, giving an *imprimatur* on which citizens will rely, it is appropriate that the state be able to gain as much knowledge about the applicant as possible. Also, there is little risk that persons would have ulterior motives for providing such information. The public interest in such a privilege was reflected in its creation by statute.

{¶ 71} If this case were about licensing contractors in Ohio, the *Jacobs* case would be applicable. But this is a case about competition, not licensing. *Jacobs* did not grant a qualified privilege which would allow podiatrists to tell potential patients that a competing podiatrist was known to have botched ingrown toenail procedures. Is it sound public policy to permit one company to sully the reputation of another when the companies are involved in bidding for the same project?

{¶ 72} The public and its concerns are well-protected in the bidding process as it now exists. Sound public policy and the orderly administration of public contracts are not furthered by eliminating recourse against competitors who negligently feed false information to public officials. It is no less damaging to the victim of defamation that the lie is told to a public entity than to a private one.

————————————————