OPINION
Plaintiff-Appellant Frans Byvank appeals from a directed verdict entered against him in his action for defamation and deceptive trade practices.
On June 4, 1997, Byvank filed a complaint in the Montgomery County Court of Common Pleas against his former employer, Defendants-Appellees Fidelity Orthopedic, Inc. ("Fidelity"), Paul Murka, president of Fidelity and Byvank's supervisor, and seven other members of the Fidelity management team. Byvank's complaint alleged that he had been defamed in a memorandum ("the Memo") drafted by Murka and given to him on January 14, 1997. A motion for summary judgment was filed by Defendants on the defamation claim on July 23, 1997; the trial court granted summary judgment to two of the management team members.
Byvank filed an amended complaint asserting a second cause of action on March 25, 1998, alleging that the remaining Defendants had also engaged in deceptive trade practices. After numerous depositions and pretrial motions, a jury trial commenced on September 8, 1998. Prior to voir dire, Byvank dismissed his claims against all Defendants except Fidelity and Murka.
On September 8-10, 1998, Byvank presented his case in chief. The following evidence was produced at trial.
Between 1988 and 1993, Byvank worked as a prosthetist and orthotist[1] at Fidelity, eventually becoming a Certified Prosthetist Orthotist ("CPO"). In 1993, Byvank resigned from Fidelity and accepted a job offer with LaForsch Orthopedic ("LaForsch"), a competitor of Fidelity's. In November of 1995, Byvank returned to Fidelity to work as a clinician, and he worked primarily at the satellite offices.
Byvank testified that he was a member of the management team for approximately three or four months upon rejoining Fidelity. Byvank explained that the management team would meet to discuss different aspects of the company and that decisions were made as a result of those discussions. Byvank stated that on the management team and in attendance at those meetings were himself, Murka, Claire Dillon, Carrie Melton, Larry Wiley Nina Gaugadharan, Valerie Luegers and eventually Douglas Davis. Byvank noted that non-management team members would attend these meetings frequently.
After months of unsuccessfully trying to work with Byvank to increase productivity at the satellite offices, on January 13, 1997, Murka typed the Memo to Byvank on his home computer. Murka brought the Memo into work the following day for proofreading by Dillon, the secretary to the Board of Directors and the person responsible for maintenance of Fidelity's records. The Memo consisted of two pages, with the first page addressing Byvank's failing business plan and the resulting economic difficulties at the Richmond and Greenville satellite offices. The Memo also suggested several choices for Byvank to remain working with Fidelity besides being a full-time employee. These proposals had been discussed at several of the prior management team meetings. The second page of the Memo contains the language at issue:
 We have had several documented incidents in clinics at the VA and Miami Valley and in our office in patient management that will make it difficult to have you be a dedicated employee at Stewart and Patterson. Dr. Pani, through Robin and Regina, and Dr. Jacob have both indicated that they do not want you to attend their clinics or manage their patients.
Byvank testified that Davis had handed him the Memo, as instructed by Murka. Murka, on the other hand, testified that he had given the Memo to Byvank with Larry Wiley present. After receiving the Memo, Byvank began seeking employment outside of Fidelity because he believed that he was going to be terminated. On February 14, 1997, Byvank was terminated from Fidelity.
Murka testified that Byvank's performance at the satellite offices had been a topic of discussion during several of the management team meetings prior to January 14, 1997. Murka stated that although the patient complaint portion of the Memo had not been discussed during management team meetings, the information may have been discussed "in principle" without the mention of specific physicians or patients. Further, Murka testified that the Memo was never circulated at any management team meetings.
Douglas Davis, a CPO formerly employed at Fidelity, testified that he had supervised Byvank in fall 1996 in the areas of business and marketing to assist Byvank in developing a business plan. Davis testified that the management team consisted of approximately six people, including himself, Murka, Dillon, Mosier, Melton, and Wiley, and that the meetings were necessary because key people at Fidelity would discuss and decide key issues, to ensure that Fidelity was being run efficiently. Davis stated that Byvank's failing performance at the satellite offices was a topic of discussion at several of the management team meetings. Davis explained that, on the morning of January 14, 1997, he had been in Murka's office and Davis had reviewed the Memo that Murka had prepared for that day's management meeting. Davis stated that he had glanced at the Memo to ensure the discussion on the satellite offices would be addressed, but he had not seen the paragraph at issue and he had not looked at the second page. Davis testified that he had not even been aware of the Memo until after the lawsuit was filed.
Only one of the physicians referenced in the Memo, Dr. Pani Akuthota, chief at the Physical Medicine and Rehabilitation at the VA Medical Center ("VA"), testified at trial. Dr. Pani stated that he had known Byvank for ten years and that Byvank had managed his patients and had attended his clinics. Further, Dr. Pani denied making the statements contained in the Memo and stated he could not recall having discussions with Murka about Byvank. Byvank testified that he had an "excellent" working relationship with Dr. Pani, as he had worked with many of Dr. Pani's patients over the years.
Regina Smith, nka Regina Lewis-Gordon ("Smith"), chief of the prosthetic treatment center at the VA, testified regarding one "incident" referred to in the Memo. In December of 1996, a VA patient named Jessy Verdine selected Capitol, a Columbus, Ohio vendor, to fit and provide him with a prosthesis. Verdine chose Capitol because he had dealt with Capitol in the past. Fidelity, as the local vendor, was only to provide Verdine with the equipment to reduce the swelling of the limb. According to Smith, Robin Red, a health technician at the VA, had approached her with extreme concerns that Byvank had fabricated a socket for Verdine without having the authority to do so, thus intruding on Capitol's business. Smith investigated and confirmed the allegations. Smith immediately called Linda Debord, Fidelity's VA liaison, to express her "displeasure" with Byvank's actions. Smith was very upset by the situation because one of her duties was to ensure that vendors, such as Fidelity, and the VA abided by the terms of their contracts. One such provision is that vendors were not to solicit patients for business. According to Smith, the whole incident was viewed by the VA as a breach of contract, and the VA could have filed for termination of contract with Fidelity. Upon Debord's recommendations, Smith talked directly to Murka about this incident, and on December 13, 1996, Murka wrote Smith a letter of apology on behalf of Fidelity. Murka promised that he would personally attend the clinic to ensure there would be no more problems.
Smith testified that she first learned about the Memo when Byvank confronted her with it, telling her that her actions were the reason he was about to be fired, and that Byvank had asked her to sign an affidavit that he had produced. She stated that after the confrontation with Byvank, she had approached Murka, who told her that the Memo was intended only as an internal communication between Murka and Byvank.
Smith also testified that she and Dr. Pani had spoken "generally" about the issues in the Memo. Although Dr. Pani never directly told her about the issues as contained in the Memo, he had "indicated" such to her. During her conversations with Murka, Smith did not specifically tell him that Dr. Pani did not want Byvank to attend VA clinics or to manage VA patients.
After his February 1997 termination from employment with Fidelity, Byvank was unemployed for two months before accepting a job with American Orthotist Prosthetist Labs in Columbus. He was offered $10,000 less than what his salary was at Fidelity. Byvank testified that his commuting expenses, relocation expenses, and salary differential had caused him to lose $180,000 as a result of his loss of employment from Fidelity.
Ronald Kidd, owner of the American Orthotist Prosthetist Lab, testified that Byvank had informed him of the allegations during the interview, that he had not spoken with anyone at Fidelity regarding the allegations, and that Byvank's references had highly recommended Byvank for employment. Kidd testified to other offers he had made to prospective employees and to how the other candidates had compared in skill to Byvank. He stated that had he not heard of the alleged bad reports on Byvank's work, he "probably" would have offered more money to Byvank. Kidd also stated that he had offered Byvank approximately $10,000 to $15,000 less because he had known that Byvank was unemployed, needed a job, and could be hired at a lower salary. Additionally, Kidd stated that he had offered Byvank less money because he had very little marketing or business experience.
Dr. Ralph Frasca, Associate Professor of Economics at the University of Dayton, testified on behalf of Byvank. Dr. Frasca estimated the total economic loss incurred by Byvank to be between $187,449 and $328,344 based on wage differentials and pension losses.
Dr. Jacob did not testify, nor was any reference made to him. No evidence was brought in regarding Robin Red, nor did she testify at trial.
On September 10, 1998, at the close of Byvank's case in chief, the trial court granted Defendants' motion for a directed verdict, finding that after construing the evidence most strongly in favor of Byvank, reasonable minds could come to only one conclusion, which was adverse to Byvank.
Byvank now timely appeals, and he raises one assignment of error.
 I.
The trial court construed the evidence at trial in favor ofdefendants-appellants, even though every element of defamation anddeceptive trade practice was proven.
Byvank contends that the trial court erred by granting a directed verdict in favor or Fidelity and Murka because he presented substantial, competent evidence that the statement at issue was defamatory, that it was not a privileged communication, and that even if a qualified privilege applied, there was sufficient evidence that the statements were made with actual malice. Fidelity and Murka argue that Byvank failed to prove the publication element of defamation, that a qualified privilege does apply to both the defamation and the deceptive trade practices claims, and because Byvank did not successfully prove actual malice, the directed verdict was proper.
Directed verdicts are governed by Civ.R. 50(A)(4), which provides:
 When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.
The plaintiff must present evidence on all essential elements of the cause of action, or the trial court shall remove the issue from the jury's consideration by directing a verdict in the defendant's favor. Rayburn v. J.C. Penney Outlet Store (1982),3 Ohio App.3d 463, 464. As this Court stated in Emmons v. CarlisleConst. Co., Inc. (Aug. 21, 1998), Montgomery App. No. 17075, unreported:
 "A motion for a directed verdict tests the legal sufficiency of the evidence rather than its weight or the credibility of the witnesses," and because it presents a question of law, the trial court's decision must be reviewed de novo on appeal. Nichols v. Hanzel (1996), 110 Ohio App.3d 591, 599.
To present a prima facie case of defamation, a plaintiff must establish that the defendant published a statement to a third person, that the third person understood the defamatory meaning of the statement, and that the statement made is actionable. Hahn v.Kotten (1975), 43 Ohio St.2d 237, 243. Once the plaintiff sets forth a prima facie case of defamation, the defendant may avoid liability by invoking the defense of qualified privilege which requires him to show that:
 "(1) he acted in good faith; (2) there was an interest to be upheld; (3) the statement was limited in its scope to the purpose of upholding that interest; (4) the occasion was proper; and (5) the publication was made in a proper manner and only to the proper parties." Mosley v. Evans (1993), 90 Ohio App.3d 633, 636, 630 N.E.2d 75, citing Hahn, supra, at 246, 331 N.E.2d 713.
Baker v. Spinning Road Baptist Church, Inc. (Sept. 11, 1998), Montgomery App. No. 17052, unreported. The purpose of the privilege is to ensure "the necessity of full and unrestricted communication concerning a matter in which the parties have an interest or duty, and is not restricted within any narrow limits."Hahn, supra, at 246. (Citations omitted.) Further, Ohio law has long held that "communications between an employer and an employee or between two employees concerning the conduct of a third or former employee made in good faith concerning a matter of common interest are within the doctrine of qualified privilege." Gaumontv. Emery Air Freight Corp. (1989), 61 Ohio App.3d 277, 289; see, also, Holloman v. Rutman Wine Co. (1983), 11 Ohio App.3d 257; Grayv. Central Motors Corp. (1977), 52 Ohio App.2d 348; McKenna v.Mansfield Leland Hotel Co. (1936), 55 Ohio App. 163.
Neither at trial nor in the trial court's entry did the court address its reasons for directing a verdict against Byvank. The trial court simply stated:
 After considering all of the evidence most strongly in favor of the Plaintiff, the Court finds that upon any determinative issue reasonable minds could come to but one conclusion and that conclusion is adverse to the Plaintiff.
Decision of the trial court, p. 1, Doc. 145. For the purpose of this appeal we will assume that Byvank did establish a prima facie
case for both his defamation claim and his deceptive trade practices claim.
Further, our review of the record indicates that the statements contained in the Memo were privileged communications. Murka produced the Memo in response to concerns and incidents brought to his attention regarding Byvank's work performance. Murka testified that these concerns had a strong impact on him because he had never experienced physicians making such comments. Thus, Murka acted in good faith in producing the Memo. Fidelity and the management team also had a strong interest in protecting the integrity of the company and its employees, and in maintaining a level of productivity and professionalism within the company. These issues surrounding Byvank's performance could have adversely affected the future of Fidelity's contract with the VA, which was a major source of referrals for Fidelity. Further, the information disseminated in the Memo was limited in scope to matters surrounding Byvank's performance with Dr. Pani's and Dr. Jacob's patients. The publication was limited to Fidelity management team members who dealt with key issues concerning the company.
Byvank argues that Dillon was non-management personnel, thus her viewing of the Memo was publication to a third party. The record reflects that Dillon was a member of the management team and was an officer of the company. Dillon served as the secretary to Murka and the rest of the Board of Directors, and she was responsible for the maintenance of Fidelity's records. As such, this communication between supervisor and secretary, both employees of Fidelity, would fall within the doctrine of qualified privilege. Similarly, we do not agree with Byvank's claim that Davis was not a proper party to view the Memo. Davis testified that he had not known about the page containing the alleged defamatory statements. Even if Murka had shared the Memo with Davis, Davis would have been a proper party because he was also a management team member and a supervisor of Byvank.
Byvank also claims that the Memo was circulated at management team meetings with non-management team members present; however, no evidence was produced at trial that the Memo was circulated at a meeting or that other Fidelity staff members were present. Instead, Murka testified that the Memo was not distributed to the management team at all and that its contents were discussed merely "in principle" in relation to other concerns that the management team had regarding Byvank's performance. No specific doctors or patients were mentioned at this meeting.
Because the record reflects that the statements were made in good faith, were limited in scope to the incidents related to Murka by Robin Red and Regina Smith, were made in a proper occasion at a management meeting where issues of common interest such as this were discussed, and the publication was done in a proper manner and to management team members only, the defense of qualified privilege does apply.
As Fidelity and Murka have successfully established the defense of qualified privilege, Byvank could not recover for defamation unless he presented clear and convincing evidence that the defamatory statements were made with actual malice. Mosley,supra, at 636. The Ohio Supreme Court explained:
 When a defendant possesses a qualified privilege regarding statements contained in a published communication, that privilege can be defeated only by a clear and convincing showing that the communication was made with actual malice. In a qualified privilege case, "actual malice" is defined as acting with knowledge that the statements are false or acting with reckless disregard to their truth or falsity.
Jacobs v. Frank (1991), 60 Ohio St.3d 111, paragraph two of the syllabus. See, also, A B-Abell Elevator Co. v. Columbus/Cent.Ohio Bldg. Constr. Trades Council (1995), 73 Ohio St.3d 1,11-12. It is not enough to prove the falsity of the statement, but a plaintiff "must prove with convincing clarity that defendant was aware of the high probability of falsity." A B-Abell, supra, at 13. (Citations omitted.) To establish that the statements were made with "reckless disregard," sufficient evidence must be presented by the plaintiff to lead a court to find that the defendant had "serious doubts" as to the truth of the publication.Id. at 12-13. A court is likely to find reckless disregard "where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call." St. Amant v. Thompson (1968), 390 U.S. 727, 732. Furthermore, the Ohio Supreme Court has held that failure to investigate the truth of the communication is not of itself enough to refute the qualified privilege defense, as "[m]ere negligence is not enough to establish actual malice." Dale v. Ohio CivilServ. Emp. Assn. (1991), 57 Ohio St.3d 112, 118.
In this case, Byvank failed to offer any evidence for reasonable minds to conclude that Fidelity and Murka made alleged defamatory statements with an awareness of a high degree of falsity or that they had serious doubts as to the truth of the statements. Byvank claims that Murka manufactured the statements attributed to Dr. Pani, but he offered no support for this claim at trial, and no evidence exists in the record that Murka invented the statements.
There is no evidence that Murka did not believe the statements he wrote in the Memo. Again, the record reflects that Murka spoke with Regina Smith and Robin Red regarding the Verdine incident at the VA and based in part on the conversations with them, Murka created the Memo. Although Smith testified that she did not specifically inform Murka that Dr. Pani did not want Byvank to manage his patients or attend his clinics; Byvank presented no evidence to show that Red did not make the statement. Without any evidence to challenge Murka's claim that Red had told him he did not want Byvank attending his clinics or managing his patients, reasonable minds could only conclude that Murka's actions were based on information he learned from Red, whose reliability and veracity he had no reason to suspect. Without such testimony, we cannot determine that Murka had an awareness of a high degree of falsity or that he had serious doubts as to the truth of the statements. Additionally, Byvank presented no evidence challenging Murka's statement that Dr. Jacob had told him that he did not want Byvank to attend his clinics or manage his patients. As such, Byvank presented insufficient evidence of actual malice so as to defeat Fidelity and Murka's qualified privilege.
Finally, Byvank alleges that it was error for the trial court to direct a verdict against him on his claim that Fidelity and Murka engaged in deceptive trade practices. Byvank contends that he presented sufficient evidence to prove the elements of deceptive trade practice and actual malice, thus Fidelity and Murka's defense of qualified privilege does not apply.
"The torts of interference with business relationships and contract rights generally occur when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." Abell, supra, at 14. Byvank claims that Fidelity and Murka participated in deceptive trade practices as described in R.C. § 4165.02(H): "A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he * * * [d]isparages the goods, services, or business of another by false representation of fact." The Ohio Supreme Court has held that the actual malice standard required to defeat the defense of qualified privilege in a defamation claim must also be met for tortious interference and disparagement claims based on the same protected communications. Id.
Based on our conclusion that Byvank failed to show actual malice so as to defeat the qualified privilege in his defamation claim, Byvank's derivative claim of deceptive trade practice also fails.
Byvank's sole assignment of error is overruled.
The judgment of the trial court will be affirmed.
BROGAN, J. and FAIN, J., concur.
Copies mailed to: Craig T. Matthews, Terence L. Fague, Hon. Adele M. Riley
[1] A prosthetist designs and fits artificial limbs. An orthotist designs and fits braces for limbs.