BAUER et al., Appellants,

v.

COMMERCIAL ALUMINUM COOKWARE COMPANY et
al.; Wood County Counsel on Alcoholism, Appellee.

[Cite as *Bauer v. Commercial Aluminum Cookware Co.* (2000), 140 Ohio App.3d 193.]

Court of Appeals of Ohio,
Sixth District, Wood County.

No. WD–99–070.

Decided Sept. 29, 2000.

*John D. Franklin,* for appellants.

*Jean Ann S. Sieler* and *Scott A. Haselman,* for appellee.

PIETRYKOWSKI, Judge.

This cause is before the court following the Wood County Court of Common Pleas' award of summary judgment to defendant-appellee Wood County Counsel on Alcoholism and Drug Abuse ("WCC"), now known as Behavioral Connections of Wood County. For the reasons that follow, we affirm the judgment of the trial court.

The following facts are relevant to the instant case. Appellants Mark Bauer, Paul Foote, Scott Fressie, Wendell Godsey, Bailey Grigsby, William Harter, Darrel Pegish, and Lawrence Walton were all employees of Commercial Aluminum Cookware Company ("CAC"), now known as Calphalon. In early 1995, CAC began plans to implement a drug-testing policy. Rebecca Hetrick, human resources director at CAC, contacted WCC for aid in drafting the drug-testing policy and for WCC to perform on-site testing.

Once the policy was complete, on September 20, 1995, CAC held an employees' meeting during which it and WCC representatives reviewed the drug-testing policy. The policy provided that all employees were to be tested, through urine and breath samples, for various illegal substances. If the results were positive, the employee and his employer would be informed of the results. The employee would then have to sign a "last chance" agreement whereby he would be subjected to possibly three or more scheduled tests in addition to being in the random testing pool. The employee could then be summarily discharged if he tested positive for certain drugs or alcohol, or if he refused to take the test.

The contract between CAC and WCC was signed on November 27, 1995. On December 5, 1995, CAC employees were required to submit to alcohol and drug testing. Relevant to the instant case, the procedures used during the collection of the urine specimens were as follows: (1) the employee would be asked for identification; (2) the collector would fill out the necessary paperwork; (3) the employee would select a specimen kit; (4) the kit would be opened in the collector's presence and the employee would take the specimen container into the restroom and, as requested, fill it to a designated mark; (5) the employee would return the container to the collector, who would then record the temperature; (6) the collector would place a label over the container to seal it, and the employee would initial the label; (7) the collector would then place the container in the inner bag and seal it; (8) the employee would complete some paperwork and receive a copy; (9) then the specimen was placed in a cooler; and (10) the specimen was, either during the lunch break or at the end of the day, taken to WCC and stored in a refrigerator until taken to the laboratory for testing.

The appellants herein were notified that they had failed the initial drug test. They all executed "last chance" agreements.

On April 3, 1996, appellants were retested by WCC using the same procedures as set forth above. The urine specimens were sent to the Medical College of Ohio ("MCO") for testing. MCO determined that the urine specimens had been tampered with and informed appellants and CAC. CAC then considered the adulterated tests as a refusal to take a test under the CAC policy and terminated appellants.

Appellants, on January 23, 1997, commenced the instant action in Lucas County against CAC, WCC, and MCO. The claims against MCO were removed to the Court of Claims and, for jurisdictional purposes, the action was then transferred to Wood County. Thereafter, while WCC's and CAC's motions for summary judgment were pending, CAC entered into a settlement agreement with appellants.

The trial court granted WCC's motion for summary judgment on September 28, 1999. On October 28, 1999, appellants filed their notice of appeal and, on December 15, 1999, the trial court filed its opinion.

In their appeal, appellants set forth the following three assignments of error:

"FIRST ASSIGNMENT OF ERROR

"The trial court abused its discretion in granting defendant–appellee's motion for summary judgment since it erred in determining the contract between appellee and Commercial Aluminum Cookware Company ('CAC') was clear and unambiguous.

"SECOND ASSIGNMENT OF ERROR

"The trial court abused its discretion in granting defendant–appellee's motion for summary judgment since it erred in determining that appellee did not owe a duty of reasonable care to plaintiffs–appellants and therefore appellee was not liable for tortious interference.

"THIRD ASSIGNMENT OF ERROR

"The trial court abused its discretion granting defendant–appellee's motion for summary judgment when it determined defendant–appellee did not make defamatory statements regarding plaintiffs–appellants."

In reviewing a grant of summary judgment, this court must apply the same standard as the trial court. *Lorain Natl. Bank v. Saratoga Apts.* (1989), 61 Ohio App.3d 127, 129, 572 N.E.2d 198, 199. Summary judgment will be granted where there remains no genuine issue of material fact and, when construing the evidence most strongly in favor of the nonmoving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C).

Keeping this standard in mind, we now address appellants' first assignment of error, in which they argue that the trial court erred in finding that the contract between CAC and WCC clearly and unambiguously provided for non-Department of Transportation ("non-DOT") testing. Importantly, we note that the testing completed by WCC for CAC markedly differs from tests performed pursuant to DOT testing guidelines. First, DOT testing tests for nanogram levels above thirty-five nanograms, whereas WCC's testing was for levels above fifty nanograms.[1] Next, the testing was not to be done as often as DOT testing and the employees were not to be directly observed giving their samples. The water was not turned off in the restroom and bluing agents were not placed in the toilet bowl. Most significantly, according to appellants, was the method of reporting a test that was potentially altered. Under DOT guidelines, the laboratory would request a retest; here, however, the laboratory reported to CAC that the tests were altered.

The record in this case reveals the following. CAC's human resources director, Rebecca Hetrick, testified in her deposition as follows:

"A: We tried to set our program up like the DOT program, however, the difference was the nanogram level. I think at the time DOT was 35 nanograms if I remember correctly. I think now they're 25, and we decided to go with the 50 nanograms.

"Q: Was there any other differences that you recall?

"A: I think DOT requires that people get tested so often, and we didn't do that either. I mean our drivers have to go through the DOT, okay? They have those. They have to meet that program along with our drug and alcohol, that's just whatever the guidelines is, but I think that's—the other thing that—and I don't know if the DOT does this or not, but we decided—what's the word for that—a physician look over all our urine specimens. And I'm not sure if DOT does that or not, but that is something that we wanted.

"Q: So is it my understanding that other than the things you've already testified to, it was your understanding that the drug testing was going to be done under the DOT guidelines?

"A: Yes, uh-huh."

Prior to CAC's signing a contract for services with WCC, there were price negotiations. The original proposal was for $57 per test. The negotiated price was for $45 per test. During negotiations, Bruce Johnson, WCC's Director of Intervention, faxed a copy of the proposed contract on August 24, 1995. The

---

1. The thirty-five nanogram level cutoff would, arguably, result in more positive drug tests than the fifty nanogram level.

contract stated that CAC would pay WCC $57 "per DOT drug test." Apparently, after a telephone conversation between Johnson and Hetrick, another proposed contract was sent that provided for $45 "non-DOT" tests. The final contract specifies "$45.00 per drug test" and, at the bottom of the signature page, is the form designation "Bruce/NonDOTalmctrct."

When asked about the price change, Hetrick responded as follows:

"Q: Other than the price, did Wood County Council indicate that they were going to offer less service?

"A: No. huh-uh.

"Q: So it was your understanding that when you entered into the contract with Wood County Council you were going to be getting drug testing that but for the cutoff of the nanogram level would be consistent with DOT testing?

"A: Yeah."

As to the price reduction and the proposed contract changes, Hetrick also stated:

"Q: * * * [I]t was mainly discussing the fees and then the reason why it was a non-DOT is because of our nanogram level.

"Q: Okay.

"A: You can't say it's DOT when we're not going to use the same nanograms. In order for it to be DOT you have to follow it."

■ Upon careful review of the record in this case, we find that CAC was aware that the testing was not going to be conducted according to DOT guidelines. As stated above, Hetrick knew that the nanogram cutoff was different and that, as a result, the testing could not be considered DOT. She was also aware of other important differences that precluded the tests from being DOT tests. Testing "consistent with" DOT testing does not mean that it was, in fact, DOT testing. Moreover, nothing in the contract specified that the testing was to be conducted according to DOT guidelines. Accordingly, appellants' first assignment of error is not well taken.

Appellants' second assignment of error alleges that even assuming that the contract called for non-DOT testing, WCC breached its duty, to appellants, of reasonable care in its collection, analysis, and reporting of the test results. In support of their argument, appellants cite case law from a variety of states, excluding Ohio.

Regarding their assigned error, appellants do not contend that they were in contractual privity with WCC; rather, appellants argue that WCC's duty arose under the tort of negligence. WCC, conversely, argues that Ohio law does not

recognize the tort of negligent interference with contractual/ business relations and, even assuming it did, there is no evidence that WCC failed to conduct the tests in a reasonable manner.

 Generally, a claim for tortious interference with a business or economic relationship requires proof that " 'one who, without a privilege to do so, induces or otherwise purposely causes a third party not to enter into, or continue, a business relationship with another, * * * is liable to the other for the harm caused thereby.' " *Brahim v. Ohio College of Podiatric Medicine* (1994), 99 Ohio App.3d 479, 489, 651 N.E.2d 30, 36, quoting *Juhasz v. Quik Shops, Inc.* (1977), 55 Ohio App.2d 51, 57, 9 O.O.3d 216, 219, 379 N.E.2d 235, 238. Upon review of Ohio case law it is apparent that such interference must be intentional because Ohio does not recognize negligent interference with a business relationship. See *Smith v. Ameriflora 1992, Inc.* (1994), 96 Ohio App.3d 179, 186, 644 N.E.2d 1038, 1042–1043; *Burnside v. Leimbach* (1991), 71 Ohio App.3d 399, 404, 594 N.E.2d 60, 62–63.

 In the instant case, the record is devoid of evidence that WCC intentionally interfered with the employer/employee relationship between appellants and CAC. Even assuming that WCC owed a duty of care to appellants, there is no evidence that the testing procedures, as set forth above, were not followed or were performed in a negligent manner. In fact, in each of their depositions, appellants were not aware of anything the collector did or failed to do that caused the tests to be adulterated.

Appellants also contend that the reporting of the tests was done negligently. Eric A. Schaub, M.D., had a verbal agreement with WCC to review the drug-screen reports from the toxicology lab. The laboratory was instructed by the particular agency, in this case WCC, whether the tests were taken and were to be tested pursuant to DOT guidelines. As medical review officer, Schaub acknowledged that when reviewing tests under DOT guidelines a test may not be reported as adulterated unless it has been verified under certain forensic procedures. Under DOT guidelines a suspicious test would have been reported as unsuitable and a retest would be recommended. Schaub testified that the CAC tests he received from WCC were not to be tested or reported pursuant to DOT guidelines.

Rebecca Hetrick states in her deposition that Schaub had called her and indicated that there was something wrong with the April 3, 1996 tests. He told her that the tests had been tampered with and that it appeared as if a citric acid-like substance had been added. This telephone call, and the copy of the reports which followed, precipitated appellants' termination at CAC.

▮ Appellants argue that Schaub was aware that such reporting could lead to the termination of appellants. As we stated above, Ohio does not recognize the tort of negligent interference with contract/business relations. However, even assuming *arguendo* that such a cause of action were viable, appellants have not demonstrated negligence on the part of Schaub and, even more importantly, they have not demonstrated that Schaub was an agent or employee of WCC in order that such negligence may be imputed.

▮ In determining whether an employer-employee or an independent contractor relationship exists, the key factual inquiry is who had the right to control the manner or means of performing the work. *Bostic v. Connor* (1988), 37 Ohio St.3d 144, 524 N.E.2d 881, paragraph one of the syllabus. To make this determination, a court should consider who controls the details and quality of the work, the hours of employment, the method and amount of payments, and the agreement between the parties. *Id.* at 146, 524 N.E.2d at 883–884. Where the manner and means of doing work is left to one who is responsible to the employer only for the result, the relationship is that of independent contractor. *Id.*

During his deposition, Schaub explained the nature of his relationship with WCC, at the time of the 1996 drug testing, as follows:

"Q: Well, with Wood County Council did you enter into a contract of some type to be the medical review officer?

"A: There is no written contract between us. We had a verbal agreement.

"Q: Well, in 1996 what was your verbal agreement with Wood County Council as far as your role as medical review officer?

"A: That for their clients that they were collecting for, I guess I should say work-related drug screens, you know, new employment or other, random, those types of drug screens, that we would receive the—that we would receive the report from the toxicology lab, review it, then I would make a report, a written report that I would—one-page written report that I would send down to Behavioral Connections, and they would disseminate out to their clients.

"* * * *

"Q: Now would that money that was generated from your reviewing of the toxicology reports from the lab go into your department or was this something that you had on the side?

"A: This is something that gets routed through toxicology. We actually did a single billing rather than getting bills from me, bills from them. Plus I had no way of generating bills. Those monies were given to toxicology. Toxicology would then take out their portion and then periodically issue me a check.

"Q: When you say issue me a check, they issued the check in your name?

"A: They issue the check in my name, and then that goes—at the present time it goes into Associated Physicians as part of my clinical duties here. At that time I'm not sure. We were just starting it up and so until we had a mechanism, the first couple of checks I took as consulting. Consulting policy changed here so at that point everything was routed through AP/MCO as part of my regular clinical revenue.

"Q: But when did the outside consultant change, what year, do you recall?

"A: I can't recall.

"Q: Well—

"A: Probably right around 1986–1996."

Appellants contend that the fact that Schaub may have been a "consultant" when he reviewed the 1996 drug tests necessitates the court's finding that he was an agent of WCC. We disagree. Again, the record is devoid of evidence that WCC controlled the manner or means of Schaub's review of the tests. *Bostic, supra,* and, therefore, Schaub's negligence, if any, cannot be imputed to WCC. Accordingly, appellants' second assignment of error is not well taken.

█ Appellants' third and final assignment of error alleges that the trial court erred when it determined that WCC did not defame appellants by publishing false information relative to allegations that they tampered with their drug tests. Based upon our determination that Schaub was an independent contractor when he relayed the test results to Hetrick, we find that WCC cannot be liable for any alleged defamatory remarks made by him at that time.[2] Accordingly, appellants' third assignment of error is not well taken.

Upon consideration whereof, we find that substantial justice has been done the party complaining, and the judgment of the Wood County Court of Common Pleas is affirmed. Costs of this appeal are assessed to appellants.

*Judgment affirmed.*

PETER M. HANDWORK and MELVIN L. RESNICK, JJ., concur.

---

2. Appellants do not claim that WCC, independent of Schaub, made any defamatory statements.