NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0798n.06
Filed: October 27, 2006

No. 05-4476

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| CROWN EQUIPMENT CORPORATION, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE NORTHERN DISTRICT OF |
| TOYOTA MATERIAL HANDLING, U.S.A., INC., | ) | OHIO |
| | ) | |
| Respondent-Appellee. | ) | |
| | ) | |

Before: GIBBONS and MCKEAGUE, Circuit Judges; FORESTER, District Judge.[*]

**JULIA SMITH GIBBONS, Circuit Judge.** Plaintiff-appellant Crown Equipment Corp. ("Crown"), an Ohio corporation engaged in the business of making lift trucks (forklifts), sued defendant-appellee Toyota Material Handling, U.S.A., Inc. ("TMHU"), a California corporation and competitor in the lift truck business, in the United States District Court for the Northern District of Ohio. Crown alleged that TMHU tortiously interfered with Crown's contractual relationship with Florida Lift, one of its Florida dealers. The court granted summary judgment for TMHU, holding that Crown failed to produce evidence showing that TMHU had any specific knowledge of Crown's

---

[*] The Honorable Karl S. Forester, Senior United States District Judge for the Eastern District of Kentucky, sitting by designation.

1

contract with Florida Lift when TMHU entered into its contract with Florida Lift or that TMHU intentionally induced Florida Lift to breach its contract with Crown. The court further held that, even if TMHU did know of and intentionally interfere with Crown's contract with Florida Lift, TMHU's interference was not improper. For the reasons below, we affirm.

## I.

Crown sells lift trucks through a network of dealers. In 1997, Crown and Florida Lift negotiated a Dealer Agreement for Florida Lift to sell Crown lift trucks in the Tampa, Florida market. This agreement was renewed every two years, with the last renewal effective until February 28, 2005. Section 3(bb) of the Dealer Agreement limited Florida Lift's ability to act as a dealer for any of Crown's competitors. It read:

> Dealer [Florida Lift] shall . . . refrain from (i) acting as a dealer or agent for any manufacturer or distributor of lift trucks, other than those relationships existing as of the effective date of this Agreement or (ii) expanding or adding to the types or lines of lift trucks carried by the dealer or agent as of the effective date of this agreement into types or lines that compete, in Crown's sole judgment, with the types or lines sold by Crown, without the prior written approval of Crown, which shall be provided only in the event that Crown, at its sole discretion, determines that the addition of such other relationships, lines, or types of lift trucks shall not in any way adversely affect Dealer's ability to fulfill its obligations under this Agreement or otherwise impede or detract from the sale and service of Crown equipment.

JA 63. The Agreement further provided for termination of the contract by Florida Lift or Crown, albeit on different terms. While the Agreement allowed Florida Lift to terminate "at any time, with or without cause, by giving written notice of such termination to Crown," JA 68, Crown could terminate only under certain conditions, including "failure by Dealer to honor any promise on Dealer's part contained in this agreement or to perform satisfactorily any of the functions, duties, or obligations imposed on Dealer thereby . . . after Dealer shall have been notified by Crown of such

2

failure and in Crown's unrestricted judgment shall have failed to correct the same within 60 days after receipt of such notice." *Id.*

In December 2003, TMHU's Tampa dealer declared bankruptcy after being unable to satisfy a debt to a TMHU customer. TMHU decided to approach Florida Lift as a potential second dealer in the Tampa region. Florida Lift had been operating as a joint Crown/TMHU dealer in the Orlando region, and Jeff Fischer, Florida Lift's CEO, had previously expressed interest in expanding its representation of TMHU in the Tampa market. Crown's senior vice president, Jim Moran, had notified Fischer, however, that it was "very unlikely" Crown would agree to a Crown/TMHU dealership arrangement in the Tampa area.

On December 12, 2003, Fischer met with Ronald Roensch, TMHU's general counsel, and Joseph Kastelic, TMHU's national dealer development manager, to discuss an agreement for the sale by Florida Lift of TMHU's lift trucks. Aware that Fischer would be contacting Crown regarding the proposal, Kastelic provided Fischer with a list of existing Crown/Toyota joint dealerships in the hope it might allay any possible concerns on Crown's part. Although Fischer attempted to contact Crown prior to signing an agreement with TMHU, he did not receive an immediate response, and on December 16, 2003, Florida Lift entered into a dealer agreement with TMHU having not yet consulted with Crown.

Upon receiving notice of the Florida Lift-TMHU agreement, John Maxa, Crown's vice president and general counsel, transmitted a letter to Fischer, dated January 12, 2004, notifying Fischer that Crown intended to terminate the Crown-Florida Lift agreement if Florida Lift did not terminate its relationship with TMHU within 60 days. On January 13, 2004, Crown filed a lawsuit in the United States District Court for the Southern District of Ohio, seeking to enforce the

3

arbitration clause in its agreement with Florida Lift. *Crown Equip. Corp. v. Fla. Lift Sys., Inc.*, No. 3:04-cv-0007-WHR (S.D. Ohio 2004).

On January 23, 2004, Fischer met with Moran and another Crown representative to discuss the TMHU agreement, the pending lawsuit, and the possibility of Florida Lift's continuing its representation of Crown. Moran presented Fischer with three options: (1) abandoning the TMHU agreement and return to the pre-agreement Crown-only dealership arrangement; (2) selling Florida Lift to Crown; or (3) allowing Crown to terminate the agreement. Fischer then met with Roensch and Dr. Shankar Basu, TMHU's president, in California on Monday, January 26, 2004. Fischer expressed his view that Florida Lift needed to represent both Crown and TMHU in order to ensure its financial stability and declined TMHU's offer to rescind the Florida Lift-TMHU agreement. Basu then offered to fund Florida Lift's litigation expenses so that Florida Lift could attempt to retain Crown as a supplier. As a result of these discussions, TMHU funded Florida Lift's defense against the Crown action for termination and breach of contract.

Crown and Florida Lift proceeded to arbitration following a determination by the district court that the arbitration clause in the Florida Lift-Crown agreement was enforceable. The arbitrator found that Florida Lift breached its agreement with Crown by entering into an agreement with TMHU and declared that Crown's termination of the agreement was justified. The district court confirmed the arbitrator's award.

Crown then filed the instant suit against TMHU in the United States District Court for the Northern District of Ohio, alleging in its second amended complaint a single claim for tortious interference with a contractual relationship. After discovery, the parties filed cross-motions for summary judgment. The court denied Crown's motion but granted TMHU's motion, determining

4

that Crown had failed to present evidence creating a genuine issue of material fact as to several elements of tortious interference.

## II.

We review a district court's grant of summary judgment *de novo*. *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A "material" fact is one "that might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We view the evidence and draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.

In order to prevail on a claim for tortious interference with a contractual relationship in Ohio, a plaintiff must prove that: 1) a contract existed; 2) the defendant knew of the contract; 3) the defendant intentionally procured the breach of the contract; 4) the defendant was not justified in procuring the breach of contract; and 5) damages resulted from the breach. *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995) (adopting Restatement (Second) of Torts § 766 (1979)). The existence of a contract in this case is undisputed, but the extent of TMHU's knowledge of the contractual relationship and intent to procure the breach of that contract are in dispute, as is TMHU's justification for interfering with the contract. As explained below, our analysis begins and ends with the knowledge prong of the tortious interference test.

The parties do not dispute that TMHU knew, or at least correctly assumed, that Crown had

5

a dealership agreement with Florida Lift. TMHU argues, however, that mere knowledge that a contract exists is not enough to satisfy the knowledge prong. Rather, it asserts that Crown must show that TMHU knew that the contract was exclusive in order to satisfy the second prong.[1]

The Ohio courts have not clarified the degree of knowledge necessary to satisfy the second prong of the tortious interference test. Under Section 767 of the Restatement, which Ohio courts have adopted, for an alleged tortfeasor "[t]o be subject to liability . . . , the actor must have knowledge of the contract with which he is interfering and of the fact that he is interfering with the performance of the contract." Restatement (Second) of Torts § 766, cmt. i (1979). We assume that the knowledge prong under this formulation requires only knowledge of the contractual relationship sufficient to put the defendant on notice that its actions could interfere with an existing contract.

Crown's claim is based on TMHU's alleged knowledge over the course of two distinct time frames: the period preceding January 26, 2004, before Florida Lift informed TMHU of the nature of its contractual relationship with Crown, and the period following January 26, when it is undisputed TMHU knew of the exclusivity provision in the Crown-Florida Lift Agreement. Crown argues that, during the initial period, TMHU had constructive notice of the exclusivity provision. As to the second time frame, the parties agree that TMHU knew that the Crown-Florida Lift agreement was exclusive after the meeting between Basu, Roensch, and Fischer on January 26, 2004. Crown asserts that TMHU's continued relationship with Florida Lift after learning of the exclusivity provision constituted a knowing, continuous interference with Crown's contractual relationship.

As to the initial period, Crown argues TMHU possessed constructive knowledge of the

---

[1]TMHU concedes that it need not have known the exact terms or wording of the contract; rather, its claim is merely that it needed to know that Crown's contract contained an exclusivity provision.

exclusivity agreement and that satisfies the knowledge prong. TMHU responds that constructive knowledge is insufficient because it improperly incorporates a negligence standard into this intentional tort. TMHU is correct that Crown's argument that it must show only that TMHU knew or should have known of the exclusivity provision wrongly imports a negligence standard into the analysis; even if TMHU were negligent in not investigating the contract details, it cannot be liable for *intentionally* interfering with that contract.[2] This is not to say, however, that Crown can only prevail on summary judgment if it proves by direct evidence that TMHU knew that Crown's contract with Florida Lift was exclusive. Rather, Crown need only provide sufficient evidence to support a "reasonable inference" that TMHU knew the nature of the relationship – i.e., that Crown's contract was exclusive. *Interroyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989).[3]

Crown contends that a jury could infer TMHU's knowledge on the basis of both general industry practice and the behavior of the parties during the course of the Florida Lift-TMHU negotiations. Crown points out that TMHU knew that Yale Materials Handling Corporation and Raymond Corporation, two other lift truck companies, utilized exclusivity agreements.[4] In addition,

---

[2]Ohio law does not recognize the tort of negligent interference with a contractual relationship. *Bauer v. Commercial Aluminum Cookware Co.*, 746 N.E.2d 1173, 1178 (Ohio Ct. App. 2000).

[3]Other courts have rejected the argument offered by TMHU and held that constructive knowledge is sufficient to establish the knowledge requirement for tortious interference of contract liability. *See Indy Lube Invs, L.L.C. v. Wal-Mart Stores, Inc.*, 199 F. Supp. 2d 1114, 1124 (D. Kan. 2002); *Tele-Port, Inc. v. Ameritech Mobile Commc'ns, Inc.*, 49 F. Supp. 2d 1089, 1092 (E.D. Wis. 1999) (noting that constructive knowledge of the facts that would lead a reasonable person to discover the nature of the relationship is sufficient for liability to attach); *D 56, Inc. v. Berry's, Inc.*, 955 F. Supp. 908, 916 (N.D. Ill. 1997). These cases apply the tort law of other states, are not binding on this court, and we decline to adopt their reasoning.

[4] Raymond is now owned by Toyota's parent corporation, but there is apparently no direct corporate relationship between it and TMHU.

7

Roensch attended a meeting of the Industrial Truck Association in fall 2003 where Raymond's exclusivity arrangement was among the meeting topics. Crown also seeks to demonstrate that TMHU knew of the restriction on multiple dealer agreements by offering evidence that TMHU was aware of Crown's likely reaction to learning of a possible TMHU-Florida Lift deal. Crown identifies a letter from Fischer to TMHU's parent stating that Crown was "anxious" about Florida Lift's joint representation of Crown and TMHU in Orlando. TMHU anticipated that Fischer's discussion with Crown would be "prickly" and provided "ammunition" in the form of a listing of existing Crown/TMHU arrangements in other markets. Moreover, TMHU agreed not to publicize its agreement with Florida Lift until after Fischer spoke to Jim Moran at Crown.

This evidence is insufficient to show that TMHU knew prior to January 26, 2004 that Crown had an exclusivity provision in its contract with Florida Lift. There is absolutely no evidence that Florida Lift or Crown directly notified TMHU of the exclusivity provision. As to TMHU's indirect knowledge, whatever TMHU had heard about other manufacturers, there is nothing in the record to indicate that TMHU knew Crown had adopted a practice of restricting its dealers to Crown products. In fact, in the Tampa market, Florida Lift sold Komatsu, Daewoo, and Linde lift trucks in addition to those manufactured by Crown. Likewise, in Orlando, Florida Lift sold both TMHU and Crown lift trucks, and the Orlando branch of Florida Lift is one of several dealerships selling joint Crown and TMHU.[5] Finally, Fischer had represented to TMHU as late as June 2002 that Florida Lift could and wished to sell Toyota products in Tampa.

---

[5]At oral argument, counsel for Crown pointed out that, although Crown had allowed its dealers to enter into distribution agreements with other manufacturers in the past, it had changed its policy. Counsel provided no explanation of how TMHU would have been aware of the change in Crown policy.

8

Crown's argument as to TMHU's anticipation of a negative reaction from Crown is similarly unavailing. The record establishes that Roensch knew Fischer wished to speak with Crown prior to entering into an agreement with TMHU and that Fischer and Roensch expected resistance or dissatisfaction from Crown. Nothing in the record tends to prove, however, that TMHU had reason to understand that Florida Lift's need to notify Crown was anything more than an exercise of business courtesy[6] or that Crown's concerns were born of anything other than generalized market competitiveness. We conclude that Crown has failed to demonstrate the existence of a genuine issue of material fact as to TMHU's knowledge, direct or indirect, of the exclusivity provision prior to January 26, 2004.

Crown offers a second argument, however, concerning TMHU's actions after January 26, 2004, when it became aware of the exclusivity provision. Crown contends that TMHU's failure to withdraw from its relationship with Florida Lift after learning of the exclusivity provision constituted continuing interference with the Crown-Florida Lift relationship. Evidence of post-breach behavior is certainly relevant in intentional interference claims insofar as it provides insight into the defendant's pre-breach knowledge or state of mind. However, evidence that a defendant learned material facts after the breach occurred is not probative of the defendant's knowledge or state of

---

[6]Crown insists that a district court has rejected TMHU's explanation of its understanding of why Florida Lift needed to consult with Crown prior to entering into an agreement with TMHU. This is not entirely accurate. A district court judge did dismiss as an "after the fact rationalization," JA 635, Florida Lift's attempt to minimize its own culpability by arguing that it did not believe it required Crown's permission to enter into other dealership agreements and notified Crown out of courtesy. The district court judge made that determination in the context of an application for a preliminary injunction in a separate proceeding initiated by Crown against Florida Lift. A finding that Florida Lift understood its obligation to inform Crown is irrelevant, however, to the issue of TMHU's knowledge of that obligation unless Florida Lift communicated that information to TMHU. There is no evidence of that.

mind at the time of breach. Thus, the fact that TMHU learned in January 2004, that the Crown-Florida Lift contract was exclusive does not suffice to prove that TMHU knew the nature of the Crown-Florida Lift relationship in December 2003, when Florida Lift breached the contract. By January 26, 2004 the date on which TMHU learned of the exclusivity provision, any interference had been fully accomplished.

Crown further argues that TMHU's defense of Florida Lift during litigation was tortious, constituting part of a plot to force Crown to continue dealing with Florida Lift during the course of the litigation in order to switch Crown customers to Toyota products. This theory cannot succeed. TMHU's post-negotiation conduct was not a new breach but rather constituted the determination of the legal consequences of that breach.[7]

We find that Crown has failed to present evidence creating a genuine issue of material fact as to TMHU's knowledge of the exclusivity provision governing the relationship of Florida Lift and Crown. This conclusion is dispositive of Crown's claim, and we need not consider the other elements of the tortious interference test.

**IV.**

For the reasons above, we AFFIRM the judgment of the district court.

---

[7] Moreover, TMHU's asserted continuing breach argument ignores the fact that Florida Lift was justified in pursuing its trial strategy, particularly in light of precedent against Yale and Raymond that held exclusivity agreements unenforceable. Because Florida Lift's defense cannot be construed as anything but protection of Florida Lift's right to judicial process, neither can TMHU's participation in that defense be countenanced as legal interference with contract. Further, there is no evidence that the decisions as to the litigation were made by TMHU rather than Florida Lift. The record indicates that TMHU's funding of Florida Lift's defense was a legitimate business strategy based on TMHU's desire to ensure the financial stability of its new dealer, not a plot to force Crown to deal with its intransigent dealer. As the district court noted, TMHU offered to release Florida Lift from its contractual obligations to TMHU. Florida Lift declined and chose to proceed with its defense.