[Cite as *Crawford v. Ohio Dept. of Edn.*, 2009-Ohio-7062.]

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

ANITA CRAWFORD

    Plaintiff

    v.

OHIO DEPARTMENT OF EDUCATION

    Defendant
    Case No. 2007-01657

Judge J. Craig Wright

DECISION

{¶ 1} Plaintiff brought this action alleging claims of defamation, tortious interference with her employment relationship, negligence, and bad faith.[1] The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶ 2} Plaintiff's claims arise as a result of the termination of her employment with the Cleveland Municipal School District (CMSD) after more than 25 years of service. Plaintiff contends that she was fired because she filed a "buffered" (inflated) annual school-bus transportation report based upon erroneous advice received from Peter Japikse, an employee of defendant, the Ohio Department of Education (ODE). The facts that form the basis of plaintiff's claims are as follows.

{¶ 3} In accordance with state law, Ohio school districts that incur student

---

[1] By entry dated May 23, 2007, the court dismissed plaintiff's claim of defamation.

transportation costs are entitled to receive funding from ODE.[2]  In order to obtain such funding, the district must submit an annual "T-1" report reflecting the number of students transported and the distance traveled on each route.  ODE determines the level of funding that the district will receive based upon the information provided in the T-1 reports.  CMSD is one of the largest school districts in Ohio, providing transportation to more than 20,000 students, and the funding it receives can surpass $10 million per year.

{¶ 4}  The T-1 data at issue in this case was prepared for the 2004-2005 school period.  On November 4, 2004, CMSD timely filed its report.  (Plaintiff's Exhibit 20.) Shortly thereafter, the district became the subject of intense media scrutiny, CMSD was criticized for the manner in which it reported student ridership.  It was alleged that the district had overstated the number of students it transported and had thus obtained more state funding than it was entitled to receive.

{¶ 5}  The media attention brought to light a conflict between ODE and CMSD regarding interpretation of reporting requirements.  Central to the controversy was a portion of the general instructions included in the T-1 report which provided that:  "[t]he data for this report shall be *the average number of pupils enrolled and regularly transported* during the first full week of October that school is in session.  Students *shall be counted* only once each day, regardless of how many vehicles they ride.  It is recommended that students *be counted* on their first conveyance."  (Emphasis added.) As a result of the media focus, it became widely known that CMSD had for many years based its reports upon the number of eligible bus riders, whereas ODE required that actual headcounts of riders be conducted.

{¶ 6}  Subsequent to the unfavorable publicity, CMSD was directed to conduct a five-day actual headcount of bus riders, and to file an amended T-1 report reflecting a daily average of the week-long count tallied for each of its bus routes.  At the time, plaintiff was employed as Director of Transportation for CMSD, a position that she had held since August 2004.[3]  In that capacity, plaintiff was responsible for overseeing the

---

[2]It is undisputed that the pertinent requirements are set forth in R.C. Chapters 3327 and 3317, and Ohio Adm.Code 3301-83.

[3]Plaintiff began her employment with CMSD in 1979; she started as a security officer and progressed through the ranks from that position.

preparation and submission of T-1 reports. Lou Marcellino,[4] plaintiff's transportation-department manager, prepared the November 4, 2004 report. Marcellino prepared the report in the same manner that he and the district had traditionally utilized; that is, he relied upon the district's "Edulog" database to obtain a count of all students eligible for transportation. The Edulog system was a bus-routing program that compiled statistics of students eligible for transportation, but did not track whether those students actually rode the buses. CMSD personnel insisted that its reporting method was justified by both the "enrolled and regularly transported" T-1 instruction language, and its duty to provide a sufficient number of buses to transport all students who were eligible for, and in need of, transportation.

{¶ 7} At the time that the controversy arose, Japikse was employed as ODE's Associate Director of Pupil Transportation, a position he had held since 2000.[5] One of Japikse's duties, along with his staff, was to collect and analyze the T-1 report data from the school districts. In conjunction with ODE area coordinators, he and his staff also provided assistance to school districts on transportation-related issues. In addition, ODE provided training sessions as to the method for preparing T-1 reports. Japikse insisted that, prior to the media controversy, he had never had reason to question CMSD's T-1 reports nor was he aware of any confusion among Ohio's school districts concerning reporting requirements. According to Japikse, the T-1 reporting instructions referencing "the average number of pupils," and the directions that students "be counted only once each day"; and that students "be counted on their first conveyance," clearly communicated that an actual headcount was required.

{¶ 8} In the process of preparing the amended report, several CMSD employees, including plaintiff, had telephone conversations with Japikse. Two of those employees, Omega Brown, Director of Human Resources, and Alan Seifullah, Director of Communications, jointly placed a call to Japikse over a speaker-phone. Brown explained to Japikse that CMSD had never conducted headcounts and that the district wanted to ensure that it complied with ODE requirements. Brown also questioned how the district was to account for students who were eligible to ride, but who were not using

---

[4]Marcellino was employed by CMSD and participated in completion of T-1 reports from 1987 up to the date of the reports at issue. His employment was also terminated.
[5]Japikse's entire career, which began in 1979, was in school district transportation.

the bus transportation at the time of the count. According to Brown and Seifullah, it was during this conversation that the concept of a count buffer originated. Specifically, it was alleged that Japikse responded to Brown's inquiry by way of an analogy concerning teachers setting up their classrooms to accommodate all their assigned students, but also including a few extra seats for students who may join their classes later. Brown interpreted that information as authorizing the addition of a buffer to the actual headcounts that would be reported in the amended T-1.

{¶ 9} Subsequent to the Brown/Seifullah telephone call, plaintiff had a conversation with Japikse. Because Brown had instructed her to use a count buffer, plaintiff raised the issue with Japikse. She specifically questioned whether the use of a buffer was permitted inasmuch as it was not referenced in the T-1 instructions. Plaintiff contends that Japikse responded by way of the same classroom analogy that he had related to Brown and Seifullah. Plaintiff also interpreted her conversation with Japikse as authorizing a buffered headcount. On January 31, 2005, CMSD filed its amended T-1 report including a four-student buffer to the average daily headcounts for each bus route. (Defendant's Exhibit H.)

{¶ 10} CMSD thereafter became the focus of renewed media attention. This time, the district was accused of intentionally submitting an inflated report in order to defraud ODE and the general tax-paying public. A particularly negative news report came out on February 8, 2005. That same day, plaintiff sent an e-mail to Japikse explaining that she believed that the T-1 report numbers were correct, but that certain students had been reported incorrectly in various categories. She stated that: "I do believe that I need to inform you that I need to make corrections to our report." (Plaintiff's Exhibit 1.)

{¶ 11} The following day, Dr. Barbara Byrd-Bennett, CMSD's Chief Executive Officer, wrote to the Ohio Superintendent of Public Instruction, Dr. Susan Tave-Zelman, both to address her concerns over the matter and to publicly affirm that the district would work with ODE to prepare an accurate T-1 report. (Plaintiff's Exhibit 2.) Additionally, Dr. Byrd-Bennett met with plaintiff and questioned her as to why a buffer had been added to the T-1 report. After plaintiff related that the idea had originated with and been confirmed by Japikse, Dr. Bryd-Bennet contacted Japikse to verify plaintiff's explanation of the matter. According to Dr. Byrd-Bennett, Japikse denied ever having

had a conversation with plaintiff. On February 11, 2005, plaintiff was notified that her employment was terminated, effective immediately. (Plaintiff's Exhibit 4.)

{¶ 12} CMSD and ODE employees then worked together to create a third T-1 report for the 2004-2005 school year. Under the supervision of ODE personnel, CMSD counted the students who actually rode on the buses and submitted those numbers, without a buffer, on February 25, 2005. (Defendant's Exhibit I.) In the following months, both ODE and CMSD conducted comprehensive investigations into the circumstances that gave rise to the T-1 reporting controversy. (Plaintiff's Exhibits 11-12.) Ultimately, plaintiff was cleared of any wrongdoing. In January 2006 plaintiff was reinstated to employment, albeit to a different position, and received her full back-pay.

{¶ 13} During her 11-month period of unemployment, plaintiff accessed her retirement benefits in order to replace her lost income. She claims in general that defendant is liable "for damages arising from [its] unlawful acts which resulted in plaintiff's being discharged and losing pension benefits." She specifically maintains that Japikse interfered with her business relationship with CMSD, that he was negligent in providing guidance regarding ODE procedures and the interpretation of T-1 reporting instructions, and that he acted in bad faith.

{¶ 14} Upon review of the documentary evidence, the testimony, and the arguments of counsel, the court finds for the following reasons that plaintiff failed to prove her claims by a preponderance of the evidence.[6]

{¶ 15} Tortious interference with a business relationship occurs when "a person, without privilege to do so, induces or otherwise purposefully causes a third person not to enter into or continue a business relationship with another." *Diamond Wine & Spirits v. Dayton Heidelberg Distributing Co., Inc.*, 148 Ohio App.3d 596, 2002-Ohio-3932, ¶23, citing *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*,

---

[6]At the close of the proceedings, the court announced that it was inclined to find in favor of plaintiff, but expressed that it questioned whether there was any master-servant relationship between CMSD and ODE to support such a conclusion. The parties were directed to address the issue in their post-trial findings of fact and conclusions of law. The parties stated in those filings that they are in agreement that no such relationship exists inasmuch as school districts are governed by school boards, and function as independent political subdivisions, not as agents of ODE. As such, ODE had no authority to direct CMSD with regard to hiring or firing decisions. See, generally, R.C. Chapters 3311 and 3313; *Avon Lake City School Dist. v. Limbach* (1988), 35 Ohio St.3d 118, 122; *Springfield Local Bd of Educ. v. Summit County Bd of Revision* (1994), 68 Ohio St.3d 493, 496; R.C. 2744.01(F). Accordingly, the issue is not further addressed in this decision.

73 Ohio St.3d 1, 1995-Ohio-66. The elements of the tort are "(1) a business relationship; (2) the tortfeasor's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom." Id. citing *Geo-Pro Servs. Inc. v. Solar Testing Laboratories, Inc.* (2001), 145 Ohio App.3d 514, 525. "'Such interference must be intentional because Ohio does not recognize negligent interference with a business relationship.'" Id. quoting *Bauer v. Commercial Aluminum Cookware Co.* (2000), 140 Ohio App.3d 193, 199.

{¶ 16} Plaintiff contends that Japikse knew or should have known that plaintiff's employment was in jeopardy when he spoke to Dr. Byrd-Bennett on February 9, 2005. She contends that he intentionally interfered with her employment relationship in that he knowingly misrepresented that he had not spoken with plaintiff or that he had authorized the use of a count buffer.

{¶ 17} The court heard the testimony of plaintiff, Brown, Seifullah, Dr. Byrd-Bennett, and Japikse regarding circumstances that led to plaintiff's termination. There was no testimony to support the contention that Dr. Byrd-Bennett informed Japikse that plaintiff's job was in jeopardy when she spoke with him on February 9, 2005. Plaintiff as much as admits the same in claiming only that Japikse "knew or should have known." However, the testimony also fails to support that contention. The most critical media account of the CMSD reporting strategy had aired the day prior to the call. Dr. Byrd-Bennett testified that she wanted to assure Japikse that she took the allegations very seriously, and that she "would get to the bottom of" what was occurring or not occurring. She did not relate to him that she was considering the termination of any person's employment. In light of the efforts of both ODE and CMSD to address the many concerns generated by the media scrutiny, it is reasonable to believe that the question of one individual's continued employment was not the focus of attention for either Dr. Byrd-Bennett or Japikse during the conversation.

{¶ 18} With respect to Japikse's denial of his conversation with plaintiff, the testimony established that on the day that he spoke with plaintiff he had attempted to contact Brown regarding CMSD's preparation of the amended T-1 report; however, his call was routed to plaintiff. There was no evidence that Japikse and plaintiff had ever had any previous contact. Plaintiff testified that when she answered the call, Japikse

told her that he was calling in response to media questions concerning the amended T-1 report, and that he asked whether the report was being prepared in accordance with the actual headcount requirement. At some point in that conversation, plaintiff raised the issue of using a buffer. Based upon the totality of the testimony offered on this issue, the court concludes that, if Japikse denied having a conversation with plaintiff, it was more likely than not due to his failure to recall a conversation with a person he did not ordinarily communicate with, or because it was not the conversation that he had intended to have when he made the call. In short, the court is persuaded that Japikse did not purposefully misrepresent that he had not had a conversation with plaintiff.

{¶ 19} Regarding the allegations that Japikse authorized the use of a buffer by way of his classroom analogy, the totality of the evidence makes clear that Japikse made that analogy in response to questions regarding the routing of buses, and not the required headcounts of student riders. The question of routing became an issue because CMSD had suffered a cut of $10 million from its transportation budget. (Plaintiff's Exhibit 2.) The cuts resulted in an extensive overhaul and revamping of CMSD's transportation operations, including the laying off of bus drivers and reductions in the number of routes covered. The evidence established that CMSD staff asked Japikse whether it should route each bus so that it was filled to maximum capacity, that Japikse advised that maximum capacity was not the requirement but that, when routing buses, extra seats could be left open for students who did not normally ride, or who might enter the district mid-year. Japikse testified adamantly and quite credibly that ODE had never used the term "buffer" or advised any school district to inflate its averaged daily headcount of bus riders. Inasmuch as Japikse's employer was responsible for allocating tax dollars to school districts, it defies logic that he or his staff would advise that bus ridership be artificially inflated. In sum, the court is convinced that there was no intentional misrepresentation of facts or interference with plaintiff's business relationship on the part of Japikse. Therefore, plaintiff's claim of intentional interference with her business relationship must fail.

{¶ 20} Plaintiff has also asserted that defendant, through Japikse, was negligent in providing advice and instruction, which resulted in the loss of her employment and retirement benefits. However, "'[t]he well-established general rule is that a plaintiff who

has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable.'" *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.* (1989), 42 Ohio St.3d 40, 45, quoting *Nebraska Innkeepers, Inc. v. Pittsburgh-Des Moines Corp.* (1984), 345 N.W.2d 124, 126. (Additional citation omitted.) See also *Floor Craft Floor Covering, Inc. v. Parma Community General Hosp. Ass'n* (1990), 54 Ohio St.3d 1, 3. "Thus, where only economic losses are asserted, damages may be recovered only in contract; there can be no recovery in negligence due to the lack of physical harm to persons and tangible things." *RWP, Inc. v. Fabrizi Trucking & Paving Co.*, Cuyahoga App. No. 87382, 2006-Ohio-5014, ¶21. (Additional citations omitted.) Accordingly, plaintiff's negligence claim must fail.

{¶ 21} Finally, plaintiff asserts a generic claim of "bad faith." The court is aware of no statutory or case law authority, nor has plaintiff cited any, that supports a claim of this nature absent a breach of a duty established by a particular contractual relationship. See *Motorists Mutual Ins. Co. v. Said*, 63 Ohio St.3d 690, 695, 1992-Ohio-94. Therefore, this claim also must fail. For the foregoing reasons, judgment shall be rendered in favor of defendant.

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

ANITA CRAWFORD

Plaintiff

v.

OHIO DEPARTMENT OF EDUCATION

Defendant
Case No. 2007-01657

Judge J. Craig Wright

<u>JUDGMENT ENTRY</u>


This case was tried to the court on the issue of liability. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of defendant. Court costs are assessed against plaintiff. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.


_____
J. CRAIG WRIGHT
Judge

cc:

Christopher P. Conomy                    Robert E. Davis
Assistant Attorney General               55 Public Square
150 East Gay Street, 18th Floor          1500 Illuminating Building
Columbus, Ohio 43215-3130                Cleveland, Ohio 44113-1998


LH/cmd
Filed December 14, 2009
To S.C. reporter December 29, 2009