NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0582n.06

No. 17-3154

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>US HERBS, LLC, et al.,</td><td>)</td><td rowspan="11"></td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>    Plaintiffs-Appellees,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>v.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>RIVERSIDE PARTNERS, LLC, et al.,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>    Defendants-Appellants.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
</table>

**FILED**
Oct 18, 2017
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

**BEFORE: KEITH, ROGERS, and McKEAGUE, Circuit Judges.**

**DAMON J. KEITH, Circuit Judge.** US Herbs was a company that grew, packaged, and shipped herbs to various grocery stores throughout the country. Herb Thyme, Inc. ("Herb Thyme") entered into an agreement with US Herbs to become US Herbs' exclusive herb supplier. Herb Thyme agreed to make monthly payments to US Herbs. Later, Herb Thyme's assets were sold to Rocket Farms Herbs, Inc. ("Rocket Farms"). Immediately following the sale, US Herbs stopped receiving monthly payments. Thereafter, suit was brought by Mati Karni (US Herbs' owner), Karni Family Farm, LLC, US Herbs, LLC, and US Herbs Co., LLC (collectively, "Plaintiffs") against Rocket Farms for breach of contract, unjust enrichment, tortious interference with a business relationship, and two counts of tortious interference with a contract. Following discovery, Rocket Farms and Plaintiffs filed cross motions for summary judgment. The district court denied Plaintiffs' motion and granted Rocket Farms' motion. This timely appeal followed. For the reasons that follow, we **AFFIRM.**

## I.     BACKGROUND

### A. Contract

US Herbs grew, packaged, and shipped herbs to various grocery stores throughout the country from 1997-2010.  In August 2010, US Herbs and Herb Thyme entered into a Supply and Licensing Agreement (the "Contract") for the purpose of transitioning Herb Thyme in as the operator of the business, in anticipation of US Herbs eventually selling the business to Herb Thyme.  Under the Contract, Herb Thyme became US Herbs' exclusive supplier of packaged herb products, meaning that Herb Thyme began filling the orders for US Herbs' customers.

### B. Modification

Between May and June of 2011, US Herbs terminated the Contract and Herb Thyme accepted that termination.  In July 2011, the two parties entered into a second agreement (the "Modification"), which was a modified version of the original Contract.

The first "Whereas" clause of the Modification recognized that, due to the arrangements made under the Contract, US Herbs' customers had effectively become Herb Thyme's customers.

In Sections 1 and 2 of the Modification, Herb Thyme agreed to pay US Herbs a certain percentage of its sales every month, which the Modification defined as "Earned Margin." These payments would be due on or before the 15th of each month, and would be based upon Herb Thyme's sales from the previous month.

In Section 3, US Herbs agreed that neither it nor any of its agents would contact any Herb Thyme customer, including those that were previously customers of US Herbs.

In Section 4, the parties agreed that the Modification would expire on June 30, 2015, unless it was terminated earlier by some breach.  The parties also agreed that the Modification

would automatically terminate if Herb Thyme failed to make any Earned Margin payment within 30 days of the due date.

In Section 5, Herb Thyme agreed that its packaging labels would identify US Herbs in the same, or a substantially similar, way as US Herbs' labels had.

Section 7 stated that the Modification superseded any prior agreement between the parties, including the Contract. It also stated that the Modification would be "binding on any successor to [Herb Thyme] or any purchaser of all or substantially all of [Herb Thyme's] stock or assets." The parties also agreed that Ohio law would govern interpretation and enforcement of the Modification.

## C. Asset Purchase Agreement

Thereafter, Herb Thyme made its monthly Earned Margin payments consistently, including the payment that was due in November 2012. During that time period, however, Herb Thyme defaulted on loan agreements it had made with third parties. As a result, Herb Thyme and its lenders agreed to sell most of Herb Thyme's assets to Rocket Farms through a secured party sale. On or about December 7, 2012, Herb Thyme and Rocket Farms entered into an Asset Purchase Agreement ("APA") to effect the sale.

In Section 2.3 of the APA, Rocket Farms disclaimed any liability arising before the closing date of the APA, any liability arising out of or related to previous contracts, or any liability arising out of or related to third party claims against Herb Thyme.

Section 12.21 of the APA defined the term "Assumed Liabilities," which refers to the list of Herb Thyme's liabilities that Rocket Farms would be assuming. Herb Thyme's liabilities under the Modification were not included in that list.

**D. Breach and Suit**

Herb Thyme failed to make the Earned Margin payment due in December 2012. US Herbs has not received any further monthly payments as outlined in the Modification.

In December 2015, Plaintiffs brought suit against Rocket Farms, claiming breach of contract, unjust enrichment, tortious interference with a business relationship, and two counts of tortious interference with a contract. In November 2016, Plaintiffs and Rocket Farms filed cross motions for summary judgment. In January 2017, the district court denied Plaintiffs' motion and granted Rocket Farms' motion. In February 2017, Plaintiffs appealed.

## II. DISCUSSION

**A. Standard of Review**

"We review a grant or denial of summary judgment *de novo*, using the same Rule 56[] standard as the district court." *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999). Federal Rule of Civil Procedure 56 states, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. Here, Plaintiffs and Rocket Farms have moved for summary judgment, and the record does not show any genuine dispute as to any material fact. Therefore, our task is to determine which movant is entitled to judgment as a matter of law.

**B. Breach of Contract**

Plaintiffs first claim that Rocket Farms breached the terms of the Modification by not remitting monthly Earned Margin payments to US Herbs. Plaintiffs argue that, despite not being a party to the Modification, Rocket Farms is nevertheless bound by its terms under Ohio law.

The Ohio Supreme Court has stated, "[A] corporation that purchases the assets of another corporation is not liable for the contractual liabilities of its predecessor corporation unless (1) the

buyer expressly or impliedly agrees to assume such liability; (2) the transaction amounts to a de facto consolidation or merger; (3) the buyer corporation is merely a continuation of the seller corporation; or (4) the transaction is entered into fraudulently for the purpose of escaping liability." *Welco Indus., Inc. v. Applied Cos.*, 617 N.E.2d 1129, 1133 (Ohio 1993).

In their summary judgment motion, Plaintiffs claim that all four of these exceptions are present in this case. However, on appeal, Plaintiffs' brief only advances an argument for the applicability of the first exception. Therefore, we will consider the arguments in furtherance of the other exceptions to be abandoned on appeal, and we will limit our analysis to the first exception. *See Eaton v. Cont'l Gen. Ins. Co.*, 59 F. App'x 719, 722 (6th Cir. 2003).

Because Rocket Farms did not explicitly assume the modification, the first exception applies only if Rocket Farms implicitly accepted the modification. A successor corporation may be held liable for the obligations of a predecessor corporation where the buyer impliedly agrees to assume such liability. *Welco*, 617 N.E.2d at 1132. An implied agreement to assume a predecessor's contractual liabilities can be established by showing that the successor has rendered performance in accordance with the predecessor's contract without any express contractual obligation to do so. *See, eg.*, *Mohammadpour v. Thomas*, No. 85474, 2005 WL 1793515 at *2 (Ohio Ct. App. July 28, 2005) (holding that a successor's payment of the predecessor's contractual debt obligations is "competent, credible evidence" of an implied agreement to assume liability); *Ragen v. Hancor, Inc.*, 920 F. Supp. 2d 810, 824 (N.D. Ohio 2013) (finding "some evidence" of an implied agreement to assume liability where the successor paid commissions to the predecessor's employees). Where an Asset Purchase Agreement expressly lists which liabilities are being assumed by the successor, however, the court is not likely to find an implied agreement to assume any liability omitted from that list. *See Howell v.*

*Atl.-Meeco, Inc.*, No. 01CA0084, 2002 WL 857685 at *3 (Ohio Ct. App. Apr. 26, 2002); *accord*

*Harwood v. Avaya Inc.*, No. C2-05-828, 2007 WL 2407054, at *2 (S.D. Ohio Aug. 22, 2007).

Here, Plaintiffs propound three arguments to show that Rocket Farms impliedly agreed to assume Herb Thyme's obligation to remit monthly Earned Margin payments to US Herbs. First, Plaintiffs state that the language used in the Modification and the APA show that Rocket Farms intended to assume Herb Thyme's liabilities under the Modification. Plaintiffs do not cite which specific language in those agreements demonstrates this, but simply refer to "all the language used in the Modification and APA, construed in the light of the surrounding circumstances. . . ." However, in Section 2.3 of the APA, Rocket Farms specifically disclaimed any liability arising out of or related to Herb Thyme's previous contracts, with the exception of a specific contract with Safeway. Moreover, in Section 12.21 of the APA, Rocket Farms' "Assumed Liabilities" are expressly defined, and the Modification is not included in that list. Therefore, the language of these agreements does not support Plaintiffs' contention that Rocket Farms impliedly agreed to assume any liability arising out of the Modification.

Second, Plaintiffs quote Section 7 of the Modification, which states that the Modification "shall be binding on any successor to [Herb Thyme] or any purchaser of all or substantially all of [Herb Thyme's] stock or assets." Plaintiffs state that Rocket Farms impliedly agreed to assume the Modification's liabilities because Rocket Farms was on notice of the Modification (and, by extension, this Section 7 provision) at the time it entered into the APA. However, Rocket Farms' awareness of the Modification does not, by itself, demonstrate an implied agreement to assume the Modification's liabilities. Again, the fact that Rocket Farms included the aforementioned portions of Sections 2.3 and 12.21 in the APA shows that there was no implied agreement to assume those liabilities. Under Ohio law, "a contract is binding only upon parties to a contract

6

and those in privity with them." *Samadder v. DMF of Ohio, Inc.*, 798 N.E.2d 1141, 1147 (Ohio Ct. App. 2003). Because Rocket Farms was not a party to the Modification, and did not otherwise accede to the contract, the Modification's future-binding clause was not applicable to it.

Third, Plaintiffs highlight Rocket Farms' conduct in an effort to show that Rocket Farms is performing according to the obligations of the Modification. Specifically, Plaintiffs argue that: 1) Rocket Farms is still shipping herbs to US Herbs' former customers, which Plaintiffs claim is an obligation mandated by the Modification; and 2) Rocket Farms is using packaging labels similar to those previously used by US Herbs, which is an obligation mandated by the Modification. Plaintiffs suggest that, in doing these things, Rocket Farms is rendering performance in accordance with some of Herb Thyme's obligations under the Modification's, which indicates that Rocket Farms has impliedly agreed to assume all such obligations.

Regarding Rocket Farms' continued business with US Herbs' former customers, Plaintiffs argue, "Rocket Farms entered into the APA with the intent to accept the obligation to service US Herbs' customers. . . . Rocket Farms did continue to service US Herbs' customers . . . ." Plaintiffs are mistaken in their assertion that Rocket Farms is fulfilling an obligation under the Modification by transacting business with US Herbs' former customers. Such business relationships are not obligated by the Modification. Therefore, this does not show that Rocket Farms is rendering performance in accordance with the Modification's obligations.

Regarding the packaging labels, the Modification requires that all labels must be "the same or substantially similar *with respect to identification of [US Herbs] . . . .*" However, Plaintiffs' summary judgment motion specifically states that Rocket Farms "substitutes its name for that of US Herbs" on the labels. This action, which violates the terms of the Modification,

certainly does not demonstrate that Rocket Farms is rendering performance in accordance with the Modification.

For these reasons, Rocket Farms did not impliedly agree to assume Herb Thyme's obligations under the Modification. Accordingly, Rocket Farms cannot breach the Modification because it is not bound by its terms.

## C. Unjust Enrichment

Plaintiffs' second claim is that Rocket Farms has been unjustly enriched by US Herbs. To establish a claim for unjust enrichment, a plaintiff must show "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment." *Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1302 (Ohio 1984).

Plaintiffs allege that they have conferred a benefit upon Rocket Farms in the form of the revenue Rocket Farms has earned from shipping herbs to US Herbs' former customers. Plaintiffs argue, "Rocket Farms is liable to US Herbs for unjust enrichment from December of 2012 through June 30, 2015 for servicing US Herbs' customers under the Modification. Additionally, Rocket Farms is liable to US Herbs after June 30, 2015 for servicing US Herbs' customers without negotiating a new supply agreement with US Herbs and without consulting Mr. Karni or US Herbs. At no point did Mr. Karni agree to allow any company to service his customers after June 30, 2015." "US Herbs developed business relationships over the course of many years with the customers to the Modification. Rocket Farms obtained over $9,000,000 in revenue from those accounts, and did not provide US Herbs with one penny."

Central to Plaintiffs' argument on this issue is the notion that US Herbs had, and still has, an exclusive right to supply herbs to its former customers because it developed the first business

relationships with them. According to Plaintiffs, "The Modification was premised on the exchange of the right to service the customer accounts . . . in return for payment of earned margin." Plaintiffs argue that the Earned Margin payments were "royalty" fees, paid by Herb Thyme in exchange for the right to transact business with US Herbs' customers. "The Modification is similar to a royalty agreement. . . . [T]he supplier had a continuing obligation to pay for the right to supply those accounts."

Viewed this way, it is easier to understand Plaintiffs' argument that Rocket Farms has been unjustly enriched by US Herbs. According to Plaintiffs, the purpose of the Modification was to allow Herb Thyme to buy US Herbs' exclusive right to supply its customers, in exchange for monthly payments. Therefore, because Rocket Farms is now exercising this "exclusive supplier" right by selling to US Herbs' former customers, Rocket Farms owes US Herbs monthly payments.

In granting Rocket Farms' summary judgment motion, the district court found that the Modification was, in fact, "a variation on a noncompete agreement." In other words, the district court found that the purpose of the Modification was to allow Herb Thyme to secure US Herbs' agreement to "refrain[] from contacting Herb Thyme's customers," in exchange for the monthly payments.

On appeal, Plaintiffs argue that "[t]he district court erred in treating the Modification as 'non-compete' agreement." Plaintiffs continue, "The district court mysteriously concluded Mr. Karni was being paid approximately $10,000 per month in royalty payments simply not to talk to those customers. . . . No matter what title the district court places on the Modification, US Herbs granted the right to service the customers under the terms of the agreement in exchange for ongoing monthly payments from the supplier."

However, a review of the Modification confirms the accuracy of the district court's assessment. The Modification is devoid of any provision mentioning "royalty" fees or exclusive rights to supply herbs to the customers. The only exclusive rights conferred by US Herbs to Herb Thyme occurred in the Contract, when Herb Thyme was appointed as *US Herbs'* exclusive supplier: "[Herb Thyme] hereby accepts the appointment as the exclusive supplier of [US Herbs'] Fresh Herb Produce *to [US Herbs]*." In other words, the Contract granted Herb Thyme the exclusive right to supply *US Herbs* with packaged herb products; no mention was made of an exclusive right to supply *the customers*.[1]

Indeed, in order for US Herbs to have granted Herb Thyme an exclusive right to supply the customers, US Herbs would have first needed to enter into agreements to obtain "exclusive supplier" rights *from* those customers. However, Plaintiffs never show, or even allege, that US Herbs had "exclusive supplier" agreements with any of its customers. Rather, Plaintiffs seem to suggest that US Herbs acquired "exclusive supplier" rights by virtue of its development of "business relationships over the course of many years with the customers . . . ." In this, Plaintiffs are clearly mistaken.

For these reasons, the revenue Rocket Farms' has earned from transactions with US Herbs' former customers is not the result of any benefit that US Herbs conferred on Rocket Farms. Under the Modification, US Herbs agreed that Herb Thyme would be its exclusive supplier and that it would refrain from contacting its former customers, in exchange for a monthly Earned Margin payment. Herb Thyme did not remit the payment that was due on December 15, 2012. Therefore, under the terms of the Modification, the agreement ended 30

---

[1] US Herbs terminated the Contract and Herb Thyme accepted that termination before the Modification was signed. Furthermore, the Modification specifically stated that the Contract had been terminated and that the Modification was superseding the Contract. In other words, even if US Herbs had been in possession of an exclusive right to supply the customers, and even if US Herbs had assigned that right to Herb Thyme in the Contract, such assignment would have ended when the Contract was terminated.

days after that due date, whereupon US Herbs was free to use a different supplier and to contact those customers again. In December 2012, Rocket Farms purchased Herb Thyme's assets and used them to transact business with customers for which US Herbs was free to compete beginning in January 2013. In short, the revenue Rocket Farms has earned was not conferred by US Herbs.

## D. Tortious Interference

Plaintiffs' remaining three claims involve allegations of tortious interference with contracts and business relationships. "The torts of interference with business relationships and contract rights generally occur when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 651 N.E.2d 1283, 1294 (Ohio 1995).

Plaintiffs first allege that Rocket Farms tortiously interfered with the Modification agreement between US Herbs and Herb Thyme.

"In order to prove a claim of tortious interference with contractual relationships under Ohio law, one must show (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages." *Georgia-Pac. Consumer Prod. LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1102 (6th Cir. 2012) (internal quotation marks and citations omitted).

Here, Plaintiffs fail to satisfy the third element of the test. There is no evidence to suggest that Rocket Farms entered into the APA or took any other action with the intent to cause Herb Thyme to breach its Modification agreement with US Herbs.

Plaintiffs next allege that Rocket Farms tortiously interfered with the agreements between US Herbs and its customers. Here, Plaintiffs fail to satisfy the first element of the test. Plaintiffs do not sufficiently demonstrate the existence of any contracts between US Herbs and customers at or around the time the APA was executed.

Lastly, Plaintiffs allege that Rocket Farms tortiously interfered with the business relationships between US Herbs and its former customers.

"The elements of tortious interference with a business relationship are (1) a business relationship; (2) the tortfeasor's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom." *Cooper v. Jones*, No. 05CA7, 2006 WL 895210 at *4 (Ohio Ct. App. Mar. 29, 2006).

Here, Plaintiffs fail to satisfy the first element of the test. Plaintiffs do not sufficiently demonstrate the existence of any business relationships between US Herbs and its former customers at or around the time Rocket Farms entered into the APA. Indeed, the first "Whereas" clause of the Modification implied that those customers ceased business relationships with US Herbs and "became customers of [Herb Thyme]" following the Contract.

Further evidence of the nonexistence of business relationships is found in Section 3 of the Modification. First, it forbade US Herbs from contacting any of its former customers. Second, it specified that none of US Herbs' agents could represent to anyone that they were affiliated with Herb Thyme in any way. Third, it stipulated that Herb Thyme would "not entertain any co-packing or supply arrangements or other additional business dealings with [US Herbs] or Mati Marni."

It is clear that, by agreeing to and complying with the terms of the Modification, US Herbs' effectively severed its business relationships with its former customers in exchange for

monthly payments. Therefore, Rocket Farms could not have tortiously interfered with those relationships at or around the time the APA was executed.

### III.    CONCLUSION

For the foregoing reasons, the district court's decision is **AFFIRMED.**